Argued May 4, affirmed June 30, rehearing denied September 8, 1914.

# CRANSTON *v.* WEST COAST LIFE INS. CO.*

(142 Pac. 762.)

**Insurance—Actions on Life Insurance Policies—Nonsuit.**

1. In an action on an insurance policy, the principal issue being whether the insurer waived conditions that the policy should not take effect until the first premium should have been paid and the policy delivered, that premiums are payable at the home office of the company or to agents producing receipts signed by certain officers, and that only the president or a vice-president, together with the secretary or assistant secretary, and they only in writing, can modify the contract, where there was evidence that the insured gave a note for the first premium to the agent of the company, and that the general agent was charged with the premium, though the soliciting agent after

*See 63 Or. 427.

transferring the note to an innocent purchaser never paid the proceeds to the general agent or to the company, a nonsuit was properly denied.

[As to parol evidence to show waiver of provisions in policy, see note in Ann. Cas. 1914C, 59. As to waiver of conditions requiring payment before delivery of insurance policy, see note in 57 Am. Rep. 514.]

**Principal and Agent—Ratification of Unauthorized Act of Agent.**

2. The ratification of an unauthorized act of an agent must be found in the intention of the principal, either express or implied, but the circumstances may be such that the law will recognize a constructive intention where none actually existed.

**Principal and Agent—Authority of Agent—"Ratification."**

3. "Ratification" takes place when one person adopts a contract for him and in his name which was not binding, because the person who made it was unauthorized.

[Effect of ratification, see note in 5 Am. St. Rep. 109.]

**Principal and Agent—Authority of Agent—Ratification is a Question of Fact.**

4. Ratification is a question of fact, usually turning on the conduct of the principal in relation to the contract or the subject of it from which his intention may be reasonably inferred.

**Principal and Agent—Authority of Agent—What Evidence is Sufficient Ratification.**

5. Deliberate and continued action of a principal with knowledge of the facts consistent with an intention to adopt the contract, or inconsistent with a contrary intention, is sufficient evidence of ratification.

**Principal and Agent Accepting Benefits—Ratification.**

6. Whenever a principal accepts the benefits of his agent's unauthorized acts with knowledge of all material facts, he ratifies them.

[Effect of retention by principal of benefit of loan procured by agent without authority, see note in Ann. Cas. 1913E, 1115.]

**Principal and Agent—Authority of Agent—Ratification.**

7. Silent acquiescence with full knowledge of the material facts may amount to a ratification if continued for an unreasonable time and third persons have acted in reliance upon and been prejudiced by such acquiescence, especially where an agent, not a stranger, has exceeded his authority.

**Insurance—Ratification of Unauthorized Acts of Agent.**

8. Since a ratification may be inferred from the mere habits of dealings between the parties, the custom of an insurance company in dealing with its general agent in the matter of premiums might give opportunity for the agent to accept promissory notes for premiums, he becoming liable to the company for its share thereof, notwithstanding provisions of the policy as to payment of premiums.

**Insurance—Agents—Ratification of Unauthorized Acts.**

9. The material facts, the knowledge of which affect the question of an insurance company's ratification of a contract issued by an

agent without a cash payment of the first premium are that the policy of insurance has been delivered to the insured and the payment of the premium made to the general agent or to a subagent authorized by him, the manner of making the payment, whether by negotiable paper or otherwise, not being of vital consequence.

**Insurance—Agents—Ratification of Unauthorized Acts.**

10.  Where the officers of an insurance company had opportunity to inform themselves as to the circumstances of the delivery of a policy and the arrangement as to the premium, and failed to do so, it would be equivalent to such knowledge.

> [As to silence as ratification of act of stranger, see note in Ann. Cas. 1912B, 151.]

**Principal and Agent—Authority of Agent—Ratification.**

11.  A ratification of an agent's acts is not required to be in writing by the fact that the authority of the agent is in writing but that rule applies only where the statute requires the authority to be in writing.

> [Ratification of what contracts not possible, see note in 59 Am. St. Rep. 638.]

**Appeal and Error—Review—Harmless Error—Instructions.**

12.  In an action on an insurance policy, instructions that the burden was on plaintiff to show that it was agreed between the soliciting agent and the insured that the insured's note was to be accepted as payment of the premium in place of payment in the manner required by the policy and to show that the agent was authorized to do so, or that after full knowledge and understanding of the transaction the company ratified it, that there was no competent proof that the agent had authority to receive the note, and whether the company became bound depended wholly on whether it ratified the act, and that the burden is on plaintiff to show ratification, and if the insurer charged the general agent with the premium and accepted his credit and held him liable therefor in place of the insured, and with that understanding caused the policy to be delivered to the insured, that would constitute a ratification, but that merely an account with the general agent, without any understanding that the company accepted his credit, does not constitute a ratification, were favorable to defendant, and hence not ground for reversal.

From Baker: GUSTAV ANDERSON, Judge.

In Banc.    Statement by MR. JUSTICE BEAN.

This is an action by Irene M. Cranston as the beneficiary named in the policy of insurance written by the West Coast Life Insurance Company on the life of Walter A. Cranston, deceased, husband of the plaintiff. The trial of this cause in the lower court resulted in a verdict for the plaintiff, on which a judg-

ment was entered, from which the defendant appeals. This is the second appeal in this case. A judgment for the plaintiff entered upon a directed verdict at the first trial of the case was reversed by this court: See *Cranston* v. *West Coast Life Ins. Co.*, 63 Or. 427 (128 Pac. 427). The plaintiff in her original complaint alleged that under the contract of insurance between Walter A. Cranston and the defendant company the former had performed all the conditions therein contained on his part to be performed. The evidence introduced at the first trial, tending to show a waiver of the conditions precedent by the defendant company, was not accepted as sustaining the allegations of the original complaint setting forth performance by Cranston. Upon the second trial, the plaintiff in her amended complaint set forth a cause of action which recognized certain conditions precedent in the policy of insurance, the nonperformance of which by Cranston the plaintiff alleged had been waived by the defendant company, and, further, that certain unauthorized acts of the agents of the company resulted in a contract of insurance coming into existence between the company and Cranston, by reason of the subsequent ratification of such acts by the company, in the following manner: Waite Thurston, agent of the company, who solicited the application for the insurance, accepted from Walter A. Cranston his negotiable promissory note in the principal sum of $27.95, payable to the order of Waite Thurston 60 days after date, in full payment and satisfaction of the first premium, and in consideration of the issuance of the policy of insurance. Thereafter, on September 1, 1910, the defendant in consideration thereof executed, transmitted and delivered to its general agent at Portland, Oregon, who, in turn, transmitted

to its soliciting agent Waite Thurston of Baker City, Oregon, the policy of insurance on the life of Walter A. Cranston, in the sum of $1,000, payable to plaintiff after notice and proof of the death of the insured. The defendant delivered the policy of insurance to Cranston, and charged to the account of H. T. Booth, its general agent, the amount of the premium, $27.95, thereby substituting the liability of the agent for that of the insured.

The defendant, in its answer to the amended pleading, denies all the facts showing its liability. In paragraph 6 the defendant admits that on or about the 24th day of August, 1910, one Waite Thurston received and accepted from Walter A. Cranston his written negotiable promissory note in the principal sum of $27.95, due 60 days after date, payable to Waite Thurston or to his order, and admits, further, that said promissory note was thereafter negotiated by Thurston, before the same was due, to innocent holders thereof for value. The defendant denies paragraph 7 of the amended complaint, except only that it admits that it executed and issued the policy of insurance in controversy in this case on the life of Walter A. Cranston in favor of the plaintiff as beneficiary, and delivered it to H. T. Booth, general agent, by placing the same in the United States mails. A denial is contained in the ninth paragraph of the answer, except that the defendant admits that, in accordance with its rules and customs, its general agents were responsible to it for all premiums received by them on behalf of the company, and that the general agents were required to remit to the defendant company at stated intervals moneys received by them and due and payable, and that such general agents were and are required to furnish and keep in force a good and sufficient bond for

the faithful performance of their duties. The defendant avers that any pretended payment of said premium on said policy of insurance by said Walter A. Cranston to Waite Thurston by delivering to him the promissory note alleged in plaintiff's complaint was wholly without effect and null and void, and was not such a payment of the premium on the policy of insurance as was by the terms and conditions thereof made a condition precedent to the policy of insurance becoming operative and valid; that the defendant company at no time had any knowledge of the fact that the policy of insurance had been delivered to Walter A. Cranston, or that he in pretended payment of the first premium thereon had delivered to Thurston the promissory note alleged in the plaintiff's complaint until long after the death of the assured, and until the respective rights and liabilities of the plaintiff herein and the defendant had become vested and fixed thereby.

The reply put in issue the new matter contained in the answer. At the close of the plaintiff's case the defendant's counsel moved the court for a judgment of nonsuit, which was denied. The defendant assigns this as error.          AFFIRMED.   REHEARING DENIED.

For appellant there was a brief over the names of *Messrs. Holman & Hampson* and *Messrs. McColloch & McColloch,* with an oral argument by *Mr. Alfred A. Hampson.*

For respondent there was a brief over the name of *Messrs. Clifford & Correll,* with an oral argument by *Mr. Morton D. Clifford.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. A detailed statement of the facts and circumstances occurring on the first trial may be found in the former opinion, and it is unnecessary to detail the same matters here. The assignments of error raise three principal questions for review in this court.

First. That the court erred in refusing to grant the defendant's motion for a judgment of nonsuit. The main question is whether or not the defendant waived the following conditions contained in the application which was incorporated into the policy of insurance:

"I hereby agree as follows: That if this application is accepted, the policy issued hereunder shall not take effect until the first premium shall have been paid and accepted by said company or its authorized agent and such policy delivered to and accepted by me while I am in good health. * * *"

And also the following statements indorsed upon the policy:

"All premiums on this policy are due and payable at the home office of the company in the City of San Francisco, but may be paid to agents of the company producing receipts signed by the president or a vice-president, secretary, or assistant secretary, and countersigned by such agents. * * Only the president, or a vice-president, together with the secretary or assistant secretary (and they only in writing signed by them) have power on behalf of the company to issue permits, or make or modify this or any contract, or extend the time for making any premium payment, and the company shall not be bound by any promise or representation heretofore or hereafter given by any person other than the above-named officers, and by them only in writing and signed conjointly as stated."

It is contended by the plaintiff that the condition precedent of paying the premium was waived by the delivery of the promissory note of Walter A. Cranston to Waite Thurston, the soliciting agent, and his acceptance of it, and the subsequent delivery of the policy of insurance by him to Cranston, and that such action by the agents of the defendant company was ratified by the latter by delivering the policy and charging the premium to H. T. Booth, the general agent. However it may be as to the knowledge of the company in regard to the acceptance of the promissory note, it is clear that it forwarded the policy of insurance to its general agent for delivery to the assured. The jury were warranted in finding that the company thereby impliedly authorized the general agent to make satisfactory arrangements in regard to the payment of the premium, and trusted to him to do so, and that the action of the agent was ratified by the delivery of the policy and allowing the same to be retained by the assured from September 1, 1910, until his death, January 31, 1911.

H. T. Booth, the general agent of the company, was called as a witness by the plaintiff, and testified, in substance, that he received the policy by mail the last of August, and forwarded it to Waite Thurston, with a transmittal letter to the effect that the policy was inclosed for delivery to the insured, for collection of the premium in due course, and for the remittance of the same; that he remembered no special instructions; that Waite Thurston remained around for six weeks or two months, collected a number of premiums that the company did not get, and left the country; that they had never been able to locate him; that he knew of the note after Thurston had left; that he then made it his business to try and trace the note, and found

that it had been sold; that he sometimes sent receipts with a policy for delivery, and sometimes did not. He further testified:

"I had an accruing interest in the business done in the State of Oregon and this necessitated, frequently, there was certain charges against it and in due course of time they adopted a credit account of premiums and the premium of Walter A. Cranston became charged to me."

That he had no correspondence with the company in regard to the policy before the death of Walter A. Cranston. That the company made no objection to the policy being out, because they had the premium charged to him. That he awaited Cranston's pleasure until after the latter became of age, and the next information that he received was that Cranston was dead. That he did not send a receipt with the policy. On cross-examination he stated that the charge was absolute when the policy was retained in the hand of Cranston more than 60 or 90 days. That under the practice if a policy was not delivered and was returned with the premium receipt to the company, the charge against the general agent would be canceled.

Mr. Julian Sonntag, secretary and treasurer of the company, who resided in San Francisco, was asked to state in his deposition what action was taken by the West Coast Life Insurance Company as a result of the receipt of the application of Walter A. Cranston for a policy. He answered:

"We executed policy No. 5557, and on or about September 2, 1910, sent it to H. T. Booth, our general agent at Portland, for delivery. * *

"Q. State what instructions, if any, were given by you to the said H. T. Booth in regard to the delivery

of said policy and said receipt to the said Walter A. Cranston.

"A. No specific instructions other than the general instructions, with which Mr. Booth was very familiar, that the policy and receipt were not to be delivered until satisfactory arrangements for the payment of the premium had been made. * *

"Q. Explain the system, or manner of doing business under which this company acts in relation with its state agents so far as making charges against them for premiums on policies of insurance is concerned, when said policies and the accompanying official receipts for the payment of the first premiums have been delivered by the company to a state agent.

"A. When a policy and premium receipt are sent to an agent, an entry is made in the company's books to that effect, and said entry remains unchanged until the company receives the premium, either through the agent or from the insured, when the account is given credit therefor. This procedure is called 'charging the agent's account,' and is for the purpose of keeping track of policies and receipts issued. If the premium be not paid and the receipt be returned to this office, the entry is canceled, the policy of course not being in effect. * *

"Q. State briefly the policy of the company in regard to accepting anything other than a cash payment for the insured for premiums, and its policy in regard to permitting its agents to accept in payment of premiums anything other than cash.

"A. The company itself accepts nothing but cash payments from its agents for premiums; what arrangements the agent may make under his contract with the company with the insured the company does not inquire into, and has no means of knowing; *any other settlement for the premium than cash is upon the agent's own responsibility.*"

Mr. Sonntag also testified that the company dealt through the general agent, Booth, who was authorized to employ subagents. He stated that Booth "was not

authorized to deliver the policy until the payment of the premium. What the agent accepted in payment of the premium was a matter between the agent and the insured of which the company could have and did have no knowledge." To the question, "Was he authorized to take the note of Walter A. Cranston or the note of any person in lieu of cash payment for said first premium?" he answered: "Not on behalf of the company. The company recognizes nothing but cash payments, and if the agent accepted a note in lieu thereof it was on his own responsibility, and was his personal private business." On cross-examination he testified that he never called on Cranston for this premium; that he wrote to Booth about it and other premiums, and kept the policy alive; that the regulations as to charging the agent were not in writing; that that was the practice of the company.

On December 19, 1910, Walter A. Cranston wrote to the defendant as follows:

"Keating, Oreg., Dec. 19, 1910.
"West Coast Life Insurance Co.
"Gentlemen: I am a minor under age and my guardian objects to me taking out a policy and will not let me have the money to pay the note, but if you will wait until January 12, 1911, I will be of age and can pay it then.     Yours truly,
"WALTER CRANSTON."

We look through the record in vain for any evidence that Walter A. Cranston repudiated the policy or note, either before or after he became of age. His letter in regard to waiting until he would be of age, and that he could then pay it, can be construed only as a request for time to make payment. The statement of the secretary and treasurer of the company that any other settlement for the premium than cash

is upon the agent's own responsibility, taken with the allegations of the answer noted above, tended to show, and the jury were warranted in concluding therefrom, that the general agent of the company was authorized to accept property or promissory notes in payment of the premium, he and his bondsmen being responsible to the company for a payment in cash of the amount so accepted; that such authority was implied when the company forwarded the policy to its general agent for delivery. The soliciting agent, Thurston, was responsible to the general agent, H. T. Booth. The company did not deal with the subagents. It appears that Booth forwarded the policy to Thurston for unconditional delivery to Cranston, which delivery was made. The policy remained in Cranston's possession without any claim on the part of the company that it should be canceled until after the death of the insured, on January 31, 1911. After proof was made the company forwarded a check to a bank at Baker for payment of the claim. Afterward the check was recalled at the instigation of its general agent Booth, on account of a failure of the subagent to make proper returns of the collection, for in effect Thurston had collected the premium by negotiating and receiving money upon the note, a large part of which, as a matter of fact, belonged to him.

It was stated by Mr. Justice McBRIDE, in *Francis v. Mutual Life Ins. Co.,* 55 Or. 280, at page 288 (106 Pac. 323, at page 326), as follows:

"It was conceded on the trial that a policy, regular in form, was actually signed by the company and sent by mail to its office in Seattle. In the absence of evidence of any other motive, the natural inference from this act would be that it was sent there for the purpose of being delivered to the deceased. The operations

of these great insurance companies have become such a part of our business life that judicial notice should be taken of the custom, generally in vogue among them, of forwarding a policy upon its final approval and execution to some agent in the vicinity of the residence of the applicant, for delivery to him: *Miller* v. *Northwestern Mutual Life Ins. Co.,* 111 Fed. 465 [49 C. C. A. 330]. * * Where a company receives an application for insurance, acts upon it, signs and seals a policy, complete in form, and forwards it to its agent for delivery to the person insured, the policy is deemed to have been issued from the date of its deposit in the mails'' (citing numerous authorities).

From the execution of the policy in question and the forwarding of the same to its general agent for delivery, as explained by the evidence, the jury were warranted in finding that the company authorized its general agent to deliver the policy to the assured upon arrangements being made for a payment of the premium satisfactory to the agent, and that Booth by forwarding the policy to his subagent authorized the unconditional delivery thereof to Cranston.

The defects in the former trial, as indicated by the opinion of the court discussing the same, were cured upon the second trial. The evidence upon the points in question was sufficient to go to the jury. There was no error in denying the motion for a nonsuit.

2. The ratification of an unauthorized act of an agent must be found in the intention of the principal, either express or implied, to ratify: 31 Cyc. 1260. In most cases it is this intention, as manifested by the principal's acts and statements, rather than by his profession as to ratification, that must determine whether the principal had a legal intent to ratify; *Forsyth* v. *Day,* 46 Me. 176; *Oregon Ry. Co.* v. *Oregon, R. & N. Co.,* 28 Fed. (C. C.) 505. The circumstances

may be such that the law will recognize a constructive intention to ratify where none was actually intended: *Smith* v. *Fletcher,* 75 Minn. 189 (77 N. W. 800); *St. Louis Gunning Adv. Co.* v. *Wanamaker & Brown,* 115 Mo. App. 270 (90 S. W. 737).

3, 4. The jury might fairly have concluded that the insurance company, by permitting the policy of insurance to be retained by the assured for some months, by "keeping it alive" (in the language of the officer of the company), and by executing and forwarding the draft to the bank, thereby accepting the benefits of the transaction conducted by and through its agent, acquiesced in and ratified whatever the agent had done in the matter; that the real controversy was between the company and its general agent on account of the acts of the subagent whom the general agent had appointed and for whom he was responsible; that these matters were not the faults of Walter A. Cranston. Ratification takes place when one person adopts a contract made for him and in his name, which was not binding upon him because the person who made it was not authorized to do so. Ratification is a question of fact, and in a great majority of instances turns on the conduct of the principal in relation to the alleged contract, or the subject of it, from which his purpose and intention in regard thereto may be reasonably inferred: Story, Agency (9 ed.), § 253 et seq.; *Baker* v. *Seaweard,* 63 Or. 350 (127 Pac. 961).

5. Deliberate and continued action of the principal, with a knowledge of the facts, consistent with an intention to adopt the contract, or inconsistent with a contrary intention, is sufficient evidence of ratification: *Oregon Ry. Co.* v. *Oregon R. & N. Co.,* 28 Fed. (C. C.) 505.

72 Or.—9

6, 7. Whenever a principal accepts the benefits of his agent's unauthorized acts with knowledge of all the material facts, he ratified the same. Silent acquiescence with full knowledge of the material facts may amount to a ratification if continued for an unreasonable length of time, and third persons have acted in reliance upon and have been prejudiced by such acquiescence, especially where an agent, not a stranger, has exceeded his authority: 1 Elliott, Contracts, § 459.

8. In many cases a ratification will be inferred from the mere habits of dealing between the parties: Story, Agency, (9 ed.), § 260. Hence, the policy of the company in dealing with its general agent in the matter of premiums had an important bearing upon the question at issue. The custom in vogue, as shown by the evidence, left ample opportunity for the agent to accept promissory notes for premiums; he becoming liable to the company for its share thereof. There was nothing 'strange or novel about the transaction.

9, 10. The question arises as to what were the material facts of which the company must have had knowledge, or an opportunity of acquiring knowledge, as a foundation for a ratification. They were that the policy of insurance had been delivered to Walter A. Cranston and payment of the premium made to the general agent of the company, or to a subagent authorized by him. Under the evidence in the case the manner of making such payment, whether with farm produce or negotiable paper, was not of vital consequence. The evidence tends to show that the company was content to look to its agent for the cash. The plaintiff was required to show that the company had knowledge of the facts constituting the transaction. If the officers of the company had an opportunity to inform themselves of the facts and circumstances

of the delivery of the policy and the arrangement as to the premium, and failed to do so, it would be equivalent to such knowledge: Reinhard, Agency, § 140.

"Where the owner of real estate makes a power of attorney to an agent to sell the land of the owner, but does not by such power of attorney authorize the agent to make conveyance thereof, and the agent, in excess of his authority, makes such a conveyance thereof, as well as sale, the principal, upon being informed, may reject such sale; but if he approves what has been done in his name, and accepts notes and mortgage given by the purchaser, and insists upon their payment after being informed of the conveyance, he thereby ratifies the conveyance and the effect of the power of attorney to convey as executed by the agent": Reinhard, § 141.

The officers of the defendant company surely had ample opportunity and time to inform themselves as to the matter of the collection of the premiums. They never by letter of inquiry or in any manner questioned the transaction. They allowed the policy to be outstanding and kept it alive until after the death of the assured.

11. It is urged by the learned counsel for defendant that as the authority of its agent was in writing the ratification must also be in writing (citing *Slotboom v. Simpson Lumber Co.,* 67 Or. 516, 135 Pac. 889). That rule obtains where the statute requires the authority of an agent to be in writing, and is not applicable to the facts in the case at bar. The authorities above referred to so indicate.

The main purpose of the clause in the application that the policy issued should not take effect until the "first premium shall have been paid" and the policy delivered and accepted by the assured while in good

health was apparently to guard against a claim that there was a contract of insurance prior to the issuance of the policy. When the policy was issued and delivered, it was a circumstance that strongly indicated to the jury that the premium had been paid, or that satisfactory arrangements had been made therefor. The following authorities are instructive, and apply with much force to the facts in this case: In *Sheldon* v. *Atlantic Fire & Marine Ins. Co.*, 26 N. Y. 460 (84 Am. Dec. 213), it is said:

"A general agent of the insurer may waive a condition in the policy that no insurance should be considered as binding until actual payment of the premium."

In *Goit* v. *National Protection Ins. Co.*, 25 Barb. (N. Y.) 189, 191, it is stated:

"It is a well-settled maxim that a party may waive the benefit of any condition or provision made in his behalf, no matter in what manner it may have been made or secured. * * It extends to all provisions, even constitutional and statutory, as well as conventional. The law will not compel a man to insist upon any benefit or advantage secured to him individually. Hence it was the privilege of the insurers in this case, if they elected so to do, to waive the condition making the actual payment of the premium a condition precedent to the binding efficacy of any insurance, as it was a provision inserted for their benefit, and in which they alone were interested."

See, also, *Lawrence* v. *Penn Mutual Life Ins. Co.*, 113 La. 87 (36 South. 898, 1 Ann. Cas. 965); *Carson* v. *Jersey City Ins. Co.*, 43 N. J. Law, 300 (39 Am. Rep. 584).

12. The second and third questions raised by the defendant are that the court erred in instructing the jury as to what acts would constitute a ratification by

the company of the unauthorized acceptance by Thurston of the promissory note of Walter Cranston, and the delivery of the policy to him without the prior payment of the premium thereon, and that the instructions were inconsistent. Over the objection and exception of the defendant the court instructed the jury to the effect that the burden of proof was upon the plaintiff to show that it was agreed and understood by and between the said Thurston and the insured that the note was to be received and accepted as and for complete payment and satisfaction of the premium, in place of payment in the manner required and specified in the policy, and further to show that Thurston was in fact authorized by the company so to do, or that after full knowledge and understanding of the transaction the company ratified it. The court further instructed the jury that there was no competent proof that Thurston had authority to receive the note or bind his principal, and therefore whether or not the company became bound thereby depended wholly upon whether the evidence showed that the company thereafter ratified the act with full knowledge thereof. The court instructed the jury as follows:

"Plaintiff also alleges that the defendant substituted and accepted the liability of its general agent Booth for the liability of said Cranston for said premium, and that the company thereby ratified the acts of the soliciting agent and waived performance of the conditions expressed in the policy and the application. This is also denied by the defendant, and this puts upon plaintiff the burden of proof thereof. As to this feature, you are instructed that if you find from the evidence this said contract or understanding was had between said general agent Booth and the company, and that after acceptance of the application

for the insurance the company did charge said Booth with said premium, and accepted his credit and held him liable therefor, in place of Cranston, and with that understanding caused the policy to be delivered to Cranston, the insured, that would constitute a ratification binding upon the company independent of whatever authority Thurston may have had at the time he received the note; but, on the other hand, merely keeping an account with the general agent without any understanding that the company did in fact accept his credit and his liability in lieu of Cranston would not constitute such ratification.''

If the instructions given brought the issues within too narrow limits, this was favorable to the defendant. Taken all together, the charge was under the evidence and circumstances of the case fair to the defendant.

We find no error in the record to sustain a reversal. The judgment of the lower court is affirmed.

AFFIRMED.    REHEARING DENIED.

Mr. JUSTICE BURNETT delivered the following dissenting opinion:

This is the second appeal in this case, a judgment for the plaintiff having been reversed by the decision of this court reported at 63 Or. 427 (128 Pac. 427). The facts disclosed in the present record are identically the same that appeared on the former appeal. That decision became the law of the case, and is binding on all subsequent litigation between the same parties for the same thing: Section 756, L. O. L.; *Powell* v. *D. S. & G. R. R. Co.,* 14 Or. 22 (12 Pac. 83) ; *Thompson* v. *Hawley,* 16 Or. 251 (19 Pac. 84) ; *Applegate* v. *Dowell,* 17 Or. 299 (20 Pac. 429) ; *Kane* v. *Rippey,* 22 Or. 299 (29 Pac. 1005) ; *Portland Trust Co.* v. *Coulter,* 23 Or. 131 (31 Pac. 282) ; *Stager* v. *Troy Laundry Co.,*

41 Or. 141 (68 Pac. 405); *Krebs Hop Co.* v. *Livesley,* 55 Or. 227 (104 Pac. 3).

In spite of the former decision, however, it is still contended that giving the note payable to the order of the soliciting agent as an individual, without naming or referring to the company in any way, was of itself payment of the premium. In *Black* v. *Sippy,* 15 Or. 574 (16 Pac. 418), Mr. Chief Justice LORD said:

"Nothing is better settled than that accepting a note is not payment of an account, nor is accepting one note in renewal of another payment of the old note, unless there is an agreement that the note should be accepted in payment."

This case has been followed in subsequent decisions of this court to the present time: *Johnston* v. *Barrills,* 27 Or. 251 (41 Pac. 656, 50 Am. St. Rep. 717); *Schreyer* v. *Turner Flouring Co.,* 29 Or. 1 (43 Pac. 719); *Kiernan* v. *Kratz,* 42 Or. 474 (69 Pac. 1027, 70 Pac. 506); *Stringham* v. *Mutual Ins. Co.,* 44 Or. 447 (75 Pac. 822). We applied the principle in our former decision to the case at bar.

In order to bind the defendant by the act of Thurston in taking a note in his own name it must appear that Thurston had authority to thus bind the company. There is no pretense of any evidence that Thurston had such authority. There is not a line of testimony tending to show that the company even held him out as being thus authorized to bind it. On the contrary, at the very inception of the transaction in the application which Cranston signed he agreed "that only the officers of the company at its home office can accept or reject this or any application and that no knowledge of any person and no statement made or given by or to any person shall bind the company or in any man-

ner affect its rights, unless such knowledge and state-
ment are set forth in writing in this application.''

He thus had actual notice of the limitation upon
the authority of Thurston. The assured further
agreed in the same application that ''the policy issued
hereunder shall not take effect until the first premium
shall have been paid and accepted by said company
or its authorized agent and such policy delivered to
and accepted by me while I am in good health.''

The policy itself, upon which the plaintiff relies and
by which she must be bound, having instituted her
action upon it, says plainly:

''All premiums on this policy are due and payable
at the home office of the company in the city of San
Francisco, but may be paid to agents of the company
producing receipts signed by the president or a vice-
president, secretary or assistant secretary, and coun-
tersigned by such agents. Only the president or a
vice-president, together with the secretary, or assist-
ant secretary (and they only in writing signed by
them), have power on behalf of the company to issue
permits, or make or modify this or any contract, or
extend the time for making any premium payment,
and the company shall not be bound by any promise
or representation heretofore or hereafter given by any
person other than the above-named officers, and by
them only in writing and signed conjointly as stated.''

Plainer or more emphatic language could scarcely
be used to impart notice to the assured of the limita-
tions on the authority of the agent with whom he was
dealing. Thurston had no such receipt, and Cranston
dealt with him at his own peril, especially so in view
of the many warnings about limitations on Thurston's
authority: *Baker* v. *Seaweard,* 63 Or. 350 (127 Pac.
961). Moreover, the evidence of the scope of Thur-
ston's authority is in writing in the form of Cranston's

application and the policy in question. Hence it is reduced to a question of law for the court, under the holding of *Baker* v. *Seaweard,* to decide whether or not the agent acted within the scope of his authority. With all these restrictions pressed upon his attention in writing it was manifest to Cranston as a matter of law that Thurston had no authority to represent that a note to himself would be taken as payment of the premium. On well-established principle the transaction cannot rightly be otherwise construed.

The record is utterly silent about whether or not even Thurston agreed that the note should be taken in payment of the premium, or that Cranston gave the note for the premium. The burden is upon the plaintiff to show that such an agreement was made. The only persons who were in a position to know whether or not the note was given and accepted even by an authorized agent as liquidation of the premium were Cranston, who is dead, and Thurston, who absconded. No utterance is attributed to either of them on that point. The record discloses that Cranston himself never paid the note, but that subsequent to his death, evidently as an afterthought, some stranger, presumably in the interest of the present plaintiff, sought out the then holder of the note and paid it to him. The fact is undisputed that the defendant never received any payment whatever on account of the policy.

It is urged, however, that the company waived this condition by charging the amount of the initial premium to its general agent when the policy was forwarded to him for delivery. This, however, was a mere matter of bookkeeping, and even if the company looked to and expected payment from its agent, or even took security from him for the payment of premiums collected by him, this was a collateral matter

which did not concern the assured, and of which he cannot take advantage because he was not a party to the transaction. It is analogous to the principle laid down in *Steel* v. *Island Milling Co.,* 47 Or. 293, 297 (83 Pac. 783, 785), where Mr. Chief Justice ROBERT S. BEAN said:

"The passing of the amount thereof to the credit of the stockholder on the books of the company was a mere matter of bookkeeping, and in no sense amounted to a payment. The payment of a pecuniary obligation is made by the delivery of money or something which is accepted by the creditor as equivalent thereto" (citing authorities).

Moreover, an essential element of waiver is that it must be an act of acquiescence on the part of the individual waiving a condition with full knowledge of all the facts upon which the waiver depends. Here there is no testimony whatever showing that the officers authorized to waive conditions on the part of the company, as stipulated by the assured in his application and in the policy which he accepted, had the least knowledge that Cranston had given his note to discharge the initial premium, or for any purpose. On the contrary, the only evidence in the case is to the effect that no one connected with the company except Thurston ever heard of the note until after the death of Cranston. The prime requisite of binding waiver is utterly absent in this case.

By a strange perversion of logic the contention is made on behalf of plaintiff that the company agreed to look to its general agent, and he to Cranston, for the payment of the premium, and that thus a novation was formed whereby the original obligation of Cranston to the company was discharged and the company accepted its general agent as responsible instead of

Cranston.  The testimony, however, does not bear out this contention, and neither is the same pleaded. Cranston did not agree to pay Booth, the general agent.  Neither did Booth agree to accept Cranston. Booth did not agree to pay the company unconditionally or at all, unless he collected the premium.  The company did not agree to accept Thurston, to whom the note was given.  Neither did Thurston agree to pay the company.  Indeed, the company does not appear to have had any direct dealings with Thurston, he being a subagent responsible only to the general agent who appointed him.  There is neither pleading nor testimony to sustain a novation.  It takes more than two parties to make such an agreement, and there is an utter failure of testimony to establish an agreement between any two parties, much less between three in this case.

If we should yield to the agrarian communistic spirit of the age, it would naturally follow that we should charge the company with the acts of Thurston which Cranston himself knew were utterly unauthorized, and so award to the plaintiff a gratuity which her husband neglected to secure for her.  But it is wrong to take something for nothing even from a life insurance company, and in obedience to this sound principle of morals, as well as of law, the judgment should be reversed.

MR. JUSTICE MOORE concurs in this dissenting opinion.