MICHEL et ux, *Appellants,*
*v.*
ICN PHARMACEUTICALS, INC., *Respondent.*

549 P2d 519

*Michael A. Corn,* Portland, argued the cause for appellants. With him on the briefs was Henry A. Carey, Portland.

*John R. Faust, Jr.,* Portland, argued the cause for respondent. With him on the brief were Hardy, Buttler, McEwen, Weiss & Newman and Donald W. McEwen, Portland.

TONGUE, J.

**TONGUE, J.**

This is a suit for specific performance of an agreement of settlement by which it was agreed, among other things, that defendant would offer for sale to the highest bidder a certain patented invention; that such bids were to be submitted not later than a specified date and that plaintiffs could bid at that sale. The trial court entered a decree in favor of defendant. Plaintiffs appeal.

Because of the findings of fact upon which that decree was based and because we must review the record *de novo* as an appeal in a suit in equity, it is necessary to consider the evidence.

### 1. *Summary of the facts.*

In a previous lawsuit between the parties plaintiffs were awarded judgment against defendant for approximately $7.6 million.[1] Following the filing of a motion to modify that judgment settlement negotiations were undertaken. These negotiations resulted in an oral agreement late on the afternoon of December 2, 1974, the date set for hearing on that motion and the day before expiration of the time for filing a notice of appeal.

Defendant's president, Mr. Panic was present and participated in those negotiations and in that oral agreement. He then left for defendant's home office in California, leaving to his local attorney, Mr. Laurence F. Janssen, the task of appearing in court the next day, at which time the terms of the oral settlement agreement were to be read into the record. One of the terms of the oral agreement of December 2d was that defendant would offer for sale to the highest bidder a patented invention referred to as the "MSP" and would permit plaintiffs to bid at such a sale for its purchase.

---

[1] Under the terms of that decree the sum of $2,217,488.38 was payable December 1, 1974.

At that time, however, no mention was made of any date for the completion of that sale.

The next morning, December 3d, the attorneys for the two parties appeared in court and Mr. Henry A. Carey, plaintiffs' attorney, read into the record from a handwritten manuscript the terms of the alleged agreement, including a statement to the effect that bids for purchase of the MSP were to be submitted not later than December 31, 1974.

According to the testimony, defendant's attorney, Mr. Janssen, then said that "there were things * * * put into the record which I had not heard before"; that he then said "I expressly cannot agree to certain of these," and that in his opinion the date of December 31st was an "unreasonable cut-off date and I would ask that a date at the end of March be set." There was testimony that Mr. Carey said that this would "blow up this settlement."

Mr. Janssen testified that one of the things that he had no authority to agree to was a date for sale of the MSP, but that he "saw nothing inherently wrong with putting a date in there"; that it was his "reaction" that "we would attempt to work out a cut-off time." He also testified that Mr. Carey then suggested "let's put January 30th in there"; that he felt that "there was no special significance at that time to the January 30th date"; that "it had to be agreed upon" and that they then "went on to something else." He also testified that "it was in the interest of all parties to get a cut-off date which was sound from a business standpoint" and that he then "honestly hope[d] that we could do it by January 30th."

According to Mr. Janssen, after this "stipulation" was "read into the record," the "way we left it" was that after a transcript of the "stipulation" was prepared "we would review it and make any corrections before we * * * sign[ed] it"; and that he signed it "with some corrections * * * as a correct and accurate trans-

cript of what actually occurred * * * and sent it down to ICN for approval or disapproval."

Mr. Janssen testified that he also "reported" what had transpired before receiving a copy of the transcript; that in doing so he was unable to reach Mr. Panic, but talked to defendant's general counsel, Mr. Hancock, to whom he reported that he was "surprised" by Mr. Carey; that there were "many things," and that he had made "notes of the things to which he objected, including this thing on the timing of the MSP," but that he did not then review all of those things (including the MSP) with Mr. Hancock and thought "the document would speak for itself." He also testified that he thought that he sent a transcript of the "stipulation" to defendant before signing it but was not sure of that fact. In any event, before signing the transcript of the "stipulation" he talked with Mr. Hancock at least to report generally what was in the "stipulation" and to say that it would be "sent down for him to review." Mr. Janssen also testified that it was his understanding that "it" was not a stipulation and an agreement, but was a "transcript" of an agreement which was to "supersede" it "in the event it was actually signed and consented to by the parties."

The original transcript of the "stipulation" was prepared with lines for signatures not only by Mr. Carey and Mr. Janssen, but also for signature by their clients. It was signed by Mr. Carey and by his clients and also by Mr. Janssen, who then sent it to his client in California. It apparently was never signed by defendant's officers and was never returned to Mr. Carey.

By letter dated December 23, 1974, defendant's president, Mr. Panic, wrote to Mr. Janssen stating, among other things, that defendant "does not have any interest in pursuing the MSP project" and that he had told plaintiffs "that it will be for sale," but that the sale "must be pursued in a fashion satisfactory to ICN, or it will not be concluded." No mention was made, however, of the January 30th "deadline."

[ 799 ]

Meanwhile, in "mid-December" 1974 defendant assigned one of its officers, Mr. Goldberg, "the responsibility to develop and put forth a bid package for the sale of the MSP and to monitor the day-to-day operations" of one of defendant's electrical engineers who had been previously engaged in making "contacts" with various possible interested purchasers, including Xerox, Tektronix, "3-M," General Electric Co., and others. That engineer then undertook to supply Mr. Goldberg with information for use in preparing a "bid package" and also undertook to put the MSP into a "demonstrable form" in order that it could be demonstrated to interested purchasers.

According to the testimony, the MSP consists of exceedingly complicated electronic equipment which will automatically transcribe telephone conversations. It was estimated that over a million dollars had been spent in its development and that although an "engineer's feasibility model" had been made, it would cost another $100,000 to complete the "prototype stage" and much more than that to get "into production." Apparently, defendant did not have sufficient funds to do so at that time.

At some undisclosed time prior to January 3, 1975, it "became apparent" to defendant that it would be "impossible" to complete and "put out" a "bid package" for sale of the MSP prior to January 30, 1975. This information was conveyed to Mr. Janssen, defendant's attorney, who gave instructions to "put all available people" on "putting it out." He also called Mr. Carey "about the timing problem."

On January 2, 1975, Mr. Janssen called Mr. Carey to say that the January 30 date could not be met. Mr. Carey responded by letter dated January 3, 1975, that plaintiffs would "resist the grant of any extension"; that he would be "out of the city * * * until January 27"; that it was understood that Mr. Janssen would "ask for a hearing on the matter no earlier than

January 27, 1975"; and that defendant should send to plaintiffs "a copy of the invitation to bid."

Twenty days later, on January 23, 1975, Mr. Janssen wrote a letter to Mr. Carey reviewing the events of December 3, 1974, and stating (apparently for the first time) that he had no authority at that time to agree upon the date of January 30, 1975, as a "cut-off time" for submission of bids for sale of the MSP; that the "stipulation" had not been signed by Mr. Panic, who also had not agreed to that date; that defendant would "stand by" the settlement agreement "as actually made" and would "timely make the second payment with interest as provided"; that it would also "put MSP up for sale" and that plaintiffs would "receive an invitation to bid," but that

"* * * [T]he sale must be a commercially reasonable one; that is, UML must be given time to construct a working model of the MSP to demonstrate to prospective purchasers. Then the prospective purchasers must have an opportunity to consider whether a bid is warranted and to obtain corporate approval to make the bid. * * *"

It appears from the "stipulation" that the "second payment" referred to by Mr. Panic was a payment of $500,000 payable on January 30, 1975, and that an initial payment in the same amount was to be paid at the time of the "stipulation." Apparently that payment had been made by defendant. The decree which was superseded by the "stipulation" had provided that the sum of $2,217,488.38 be paid on December 4, 1974. The "stipulation" also provided that in consideration of defendant's promise to make the payments as agreed upon plaintiff would dismiss without prejudice an action then pending in the United States District Court against defendant. Apparently that suit was dismissed by plaintiffs as provided by the "stipulation."

Mr. Carey responded to Mr. Janssen by letter dated January 29, 1975, stating that both parties were "bound by the terms of the stipulation" and attaching a bid by plaintiffs, dated January 30, 1975, to purchase the MSP for the sum of $15,000.

In reply, by letter dated February 13, 1975, Mr. Janssen informed Mr. Carey that defendant "will not sell the MSP to Mr. Michel for $15,000 at this time" because, among other reasons, "[n]o cut-off date for the submission of bids was agreed upon by ICN," but that it was "prepared to sell MSP within a commercially reasonable time"; that he believed that invitations to bid would be issued by February 21st and that "the bid process can be completed on or before April 15, 1975."

A further letter dated February 21, 1975, was mailed by defendant to plaintiffs attaching a nine-page description of the MSP physical design, "process" and "uniqueness" and stating that all bids must be submitted not later than April 15, 1975, and that "a minimum bid of $100,000 will be required." That "invitation" for bids was sent to "60 or 70 companies" and replies were received from "approximately 10 companies."

Meanwhile, on February 19, 1975, plaintiffs filed this suit for specific performance, demanding that a decree be entered requiring defendant to convey the MSP to plaintiffs "upon tender by the plaintiffs of $15,000."

2. *The terms of the "stipulation" were ratified by defendant.*

The findings of fact entered by the trial court concluded with the following finding.

"8. The parties did not enter into a binding and enforceable agreement for the sale of 'MSP' in accordance with the recitations contained in Exhibit 2, in that:

"(a) Defendant's attorney was not authorized to enter into an agreement for the sale of said property in accordance with the terms recited in Exhibit 2.

"(b) The colloquy between counsel contained in Exhibit 2 relating to a proposed sale of 'MSP' was tentative and indefinite and not sufficient to constitute an agreement."

[ 802 ]

In assigning error to these findings plaintiffs contend that defendant's attorney had both actual and apparent authority to agree on January 30, 1975, as the "cut-off" for sale of the MSP and to sign the "stipulation" which included that provision. Plaintiffs also contend that the evidence clearly shows that the parties entered into an agreement that the MSP would be sold to the highest bidder and that "the only dispute in the case has been the timing of the sale."

In response, defendant contends that defendant's attorney had "neither actual or apparent authority to negotiate any deadline not included in the agreement made" and that there was no "meeting of the minds on a sale of the MSP, certainly no agreement on any deadline for that sale."

We believe it to be clear from the evidence that there was a settlement agreement between the parties and that it was agreed that as a part of that agreement the MSP would be sold to the highest bidder. We also believe that any dispute as to whether there was an agreement on December 4, 1974, upon a "deadline" or "cut-off" date for that sale and whether defendant's attorney had authority at that time to agree upon the date of January 30, 1975, for that purpose need not now be decided because of what we consider to have been a subsequent ratification by defendant of the agreement, as claimed by plaintiffs, that the MSP would be put up for sale to the highest bidder on or before that date.

It appears from the transcript of the proceedings at the time of the "stipulation" that among the terms of the settlement as read by Mr. Carey at that time was the statement that "all bids must be submitted no later than December 31, 1974." After Mr. Janssen said that some matters had been included by Mr. Carey which had not been previously discussed and that he could not agree to "certain of them," he went on to "ask that a date of the end of March be set." After some further discussion Mr. Carey said "let's put January 30 in

there." There was no further discussion of that item. The transcript of the proceedings in that form was not only signed by Mr. Janssen, but was transmitted to defendant's president and general counsel.

The record is clear that defendant then proceeded in an attempt to make the preparations necessary to offer the MSP for sale to the highest bidder by January 30, 1975. Although defendant later found that this time was too short, defendant did not then deny that it had agreed to make the sale by that date or that Mr. Janssen had authority to agree upon that date. Instead, it asked plaintiffs to agree upon an extension of that date.

Plaintiffs then promptly informed defendant that they would not agree to such an extension and took the position that both parties were bound by the terms of the settlement agreement, including the sale of the MSP to the highest bidder by January 30, 1975. Again, instead of promptly taking the position that there had been no agreement for such a sale by that date and that Mr. Janssen had no authority to agree upon that date, defendant waited 20 days before responding. Only by letter dated January 23, 1975, seven days before the "deadline," did defendant inform plaintiffs that such was its position. Even then defendant made no attempt to either deny or rescind the entire settlement agreement, but stated that it would make the second payment of $500,000 due on January 30th. If the settlement agreement had been denied or repudiated, the terms of the original decree which were the subject of the settlement agreement would have been reinstated. Under the terms of that decree defendant was required to pay $2,217,488.38.

We hold that under these facts there was a ratification by defendant of an agreement to offer the MSP for sale on bids to be submitted by January 30, 1975. Although the question of ratification is ordinarily a question of fact and although we normally accord great weight to findings of fact by trial courts in suits

in equity, we note that the trial court made no finding of fact on the question of ratification, but only a conclusion of law that "Defendant did not by its conduct in any manner ratify and approve the terms and conditions contained in Exhibit 2 [the "stipulation"] for the sale of 'MSP.' " We disagree with that conclusion of law.

In *Kneeland v. Shroyer*, 214 Or 67, 94, 328 P2d 753 (1958), this court approved the following rules as stated in Restatement of Agency § 94 (1932), and comment "c":

"An affirmance of an unauthorized transaction may be inferred from a failure to repudiate it.

"\* \* \* \* \*

"c. If a third person, who has had dealings with a purported agent, reports these to the purported principal under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time is, unless explained sufficient evidence of affirmance."

Defendant contends that there was no ratification in this case because: (1) "defendant did not acquiesce," but "acted with reasonable promptness in disaffirming the attorney's authority"; (2) "There must be some showing of prejudice resulting from acquiescence," citing *Cranston v. West Coast Life*, 72 Or 116, 130, 142 P 762 (1914), and (3) "both parties have accepted benefits of the agreement that was actually made."

As to these contentions, we would observe that: (1) in delaying its "disaffirmance" for 20 days defendant did not do so within a reasonable time, in our judgment; (2) under the rule adopted in *Kneeland* prejudice is not a required element;[2] and (3) defendant has

---

[2] Ratification is based upon waiver—the intentional relinquishment of a known right—rather than upon estoppel. Thus, an implied ratification may be inferred when a party acts, or fails to act, with full knowledge of the facts. Although ratification is sometimes spoken of as an estoppel, so as to involve the requirements of reliance and prejudice, these elements are not

cited no authorities, and we have found none, to support the contention that there can be no ratification when both parties have accepted the benefits of an agreement.

Indeed, as held in *Phillips v. Colfax Company, Inc.,* 195 Or 285, 296, 243 P2d 276, 245 P2d 898 (1952):

> "It is elementary that when a corporation with full knowledge of the facts, accepts and retains the benefits of an unauthorized contract, it will be bound thereby. * * *"

In any event, as held in *Cram v. Tippery,* 175 Or 575, 581, 155 P2d 558 (1945):

> "* * * 'no rule of law is more fundamental than if the principal elects to ratify any part of the unauthorized act of an agent he must ratify the whole,' [citations omitted]."

See also Restatement of Agency 2d § 96 and § 98 (1958).

In this case, as previously stated, plaintiffs made it clear to defendant by their letter dated January 3, 1975, that plaintiffs took the position that one of the terms of the "stipulation" for settlement, as negotiated with Mr. Janssen and signed by him, was that the MSP would be offered for sale on bids to be submitted not later than January 30, 1975. With full knowledge of that fact, defendant sought to ratify and retain the benefits of the terms of the settlement agreement which provided for a reduced schedule of payments, so as to permit it to make a payment of $500,000 on January 30th, rather than risk the hazard of a repudiation of the settlement, so as to restore the terms of the previous court decree under which it would have been required to pay over two million dollars.

---

required for a ratification based upon waiver, as in this case. See *Depot R. Syndicate v. Enterprise B. Co.,* 87 Or 560, 575-76, 170 P 294, 171 P 223 (1918). See also Restatement of Agency 2d § 82, comment c and § 92(a) (1958). To the extent that *Cranston v. West Coast Life,* 72 Or 116, 130, 142 P 762 (1914), is inconsistent with this holding it is overruled.

For all of these reasons, we hold that defendant, by its conduct, ratified the "stipulation" for settlement, including its provision that the MSP be offered for sale on bids to be submitted no later than January 30, 1975. It does not necessarily follow, however, that plaintiffs are entitled to a decree requiring the sale of the MSP to them upon payment of $15,000, for reasons next discussed.

■ 3. *Plaintiffs are not entitled to a decree requiring sale of the MSP to them for $15,000.*

The trial court made the following additional conclusions of law:

"7. If the parties had agreed upon all the terms and conditions necessary to create an agreement for the sale of 'MSP' it would not be just and equitable under all of the facts and circumstances to grant the equitable relief of specific performance."

For reasons previously stated, we have held that defendant ratified the "stipulation" for settlement, including its provision that the MSP be offered for bids to be submitted no later than January 30, 1975. We believe that it would not be inequitable to grant specific performance of that agreement, including its provisions that defendant offer the MSP for sale on bids to the highest bidder. We do not believe, however, that it necessarily follows that because defendant breached that agreement the plaintiffs are entitled to a decree requiring defendant to sell the MSP to them for $15,000. We do not believe that the power of a court of equity in a suit for specific performance of a contract is so confined as to require such a result.

In *Patecky v. Friend et al,* 220 Or 612, 626-27, 350 P2d 170 (1960), we said that:

"The general rule is stated in *Public Market Co. v. Portland,* 160 Or 155, 162, 83 P2d 440, to be:

" 'It is an established principle of law that a contract must be performed in its entirety if performed at all under compulsion of a court of equity * * *.'

There are exceptions to the general rule apparently intended for the benefit of the party seeking the relief.

[ 807 ]

Oregon recognizes that a purchaser of land may take less than the quantity bargained for. *Bartholomew v. Bason,* 188 Or 550, 214 P2d 352. Volume 2, Restatement of Contracts 638, § 359(2), states that the decree need not be absolute in form and the performance that it requires need not be identical with that promised in the contract; it may be drawn so as to best effectuate the purposes for which the contract was made, and it may be granted on such terms and conditions as justice requires. * * *"

This is in accord with the following rules as stated in Restatement of Contracts § 359 (1932), and comments *"b"* and *"c"*:

"(1) If the remedy in damages is found by the court to be inadequate, the determination of whether specific enforcement shall be decreed and what shall be the terms of the decree rests in the sound judicial discretion of the court, subject to the rules stated in §§ 360-380.

"* * * * *

"*b.* * * * The flexibility in the form and the terms of the decree require a sound judicial discretion in every step in its drafting.

"*c.* The exact performance that is promised in a contract may be, in part or in whole, very difficult of enforcement, it may have become impossible or unlawful, and it may be such that exact enforcement would work unreasonable hardship. * * *"[3]

See also *Phillips v. Johnson,* 266 Or 544, 558-59, 514 P2d 1337 (1973).

In our judgment, the essence of what plaintiffs bargained for, and what they are entitled to, is that defendant be required to offer the MSP for sale to the high-

---

[3] Although not directly in point, it is also to be noted that Restatement of Contracts § 367 (1932), provides as follows:

"Specific enforcement of a contract may be refused if

(a) the consideration for it is grossly inadequate or its terms are otherwise unfair, or

(b) its enforcement will cause unreasonable or disproportionate hardship or loss to the defendant or to third persons, or

(c) it was induced by some sharp practice, misrepresentation, or mistake."

est bidder and that they have an opportunity to bid at that sale.[4] Accordingly, we remand this case to the trial court with instructions to prepare and enter a decree of specific performance that will require defendant to do so and upon such terms, including limitations of time for the completion of such a sale, as the trial court may find to be fair and reasonable after giving both parties an opportunity to be heard.

Reversed and remanded.

_____

[4]It is implicit, however, that plaintiffs be entitled to submit a bid for purchase of the MSP for any amount, without the imposition by defendant of any requirement limiting bids to sums above any specified minimum.