Filed: December 20, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

SYNECTIC VENTURES I, LLC,
an Oregon limited liability company;
SYNECTIC VENTURES II, LLC,
an Oregon limited liability company;
SYNECTIC VENTURES III, LLC,
an Oregon limited liability company,

Plaintiffs-Appellants,
Petitioners on Review,

v.

EVI CORPORATION, an Oregon corporation,
dba Endovascular Instruments, Inc.;
SYNECTIC VENTURES IV, LLC,
an Oregon limited liability company;
SYNECTIC VENTURES V, LLC,
an Oregon limited liability company;
and SYNECTIC ASSET VENTURES, LLC,
purportedly an Oregon limited liability company,

Defendants-Respondents,
Respondents on Review.

(CC 060404199; CA A139879 (Control), A142184; SC S059454)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 10, 2012.

Scott A. Shorr, Stoll Stoll Berne Lokting & Shlachter PC, Portland, argued the cause for petitioners on review. With him on the brief were Gary M. Berne, Mark A. Freil, and Roy Pulvers, Hinshaw & Culbertson LLP, Portland.

Kevin H. Kono, Davis Wright Tremine LLP, Portland, argued the cause for respondents on review. With him on the brief were Robert D. Newell and Derek D. Green.

Cody Hoesly, Larkins Vacura LLP, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

DE MUNIZ, J.

The decision of the Court of Appeals is reversed.  The judgments of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

*Appeal from Multnomah County Circuit Court, Henry C. Breithaupt, Judge Pro Tempore. 241 Or App 550, 251 P3d 216 (2011).

DE MUNIZ, J.

Plaintiffs -- Synectic Ventures I, LLC, Synectic Ventures II, LLC, and Synectic Ventures III, LLC -- entered into a loan agreement regarding money that they had loaned to defendant EVI Corporation. The loan agreement provided that the loan, which was secured by a security interest in essentially all of defendant's property, would be converted to equity ownership in defendant, if defendant obtained additional financing by a certain date. Shortly before that deadline, the managing member of plaintiffs -- who was also chairman of the board and treasurer of defendant and financially interested in defendant -- entered into an agreement purporting to extend the loan period by an additional year. During the extension period, defendant obtained the additional financing and converted the debt to equity. Plaintiffs filed an action against defendant, asserting (among other things) that they were not bound by the extension because the managing member had had a conflict of interest and defendant knew of the conflict. The trial court rejected that argument and granted summary judgment for defendant. The Court of Appeals affirmed. *Synectic Ventures I, LLC v. EVI Corp.*, 241 Or App 550, 251 P3d 216 (2011). On review, we conclude that the trial court erred in granting defendant summary judgment. We therefore reverse the decision of the Court of Appeals and the judgment of the trial court.

## I. FACTS AND PROCEDURAL POSTURE

A. *Underlying Facts*

As noted, this case is before us on review from a trial court's grant of summary judgment for defendant. Accordingly, we consider the facts, as well as all

1

reasonable inferences from those facts, in the light most favorable to the nonmoving party -- in this case, plaintiffs. *Loosli v. City of Salem*, 345 Or 303, 306 n 1, 193 P3d 623 (2008); *see* ORCP 47 C (on summary judgment, trial court must determine whether there is no genuine issue of material fact "based upon the record before the court viewed in a manner most favorable to the adverse party").

Plaintiffs are manager-managed limited liability companies (LLCs).[1] Plaintiffs' purpose, as identified in their operating agreements, was to invest plaintiffs' funds in all types of securities of other corporations. Plaintiffs, in turn, were capitalized by their members, who are individuals or entities seeking investment gains from the money they contributed to plaintiffs; plaintiffs are, in effect, investment vehicles for their

---

[1]   Plaintiffs assert that they are member-managed LLCs, but defendant disputes that assertion. The distinction between manager-managed LLCs and member-managed LLCs has some significance here, as the LLC management type often determines which statutory provisions apply. *See, e.g.,* ORS 63.130(1) (listing rights of members in member-managed LLC); ORS 63.130(2) (listing rights of managers in manager-managed LLC).

We agree with defendant that plaintiffs are manager-managed LLCs because all their operating agreements specifically designate a manager. *See* ORS 63.001(20) (defining "manager-managed limited liability company" to include an LLC "whose articles of organization otherwise expressly provide that the limited liability company will be managed by a manager or managers"); *compare* ORS 63.001(22) (defining "member-managed limited liability company" as all other types of LLCs). Although each operating agreement designated the manager as the "Managing Member," that would not transform plaintiffs into member-managed LLCs. *See* ORS 63.001(19) (by implication: "'Manager' or 'managers' means a person or persons, *who need not be members*, designated by the members of a manager-managed limited liability company to manage the limited liability company's business and affairs." (Emphasis added.)).

2

members.  At all relevant times, plaintiffs were managed by Craig Berkman.[2]

Plaintiffs' operating agreements contained a number of provisions relevant to the scope of Berkman's authority to act on plaintiffs' behalf.  Because the scope of that authority is integral to the proper resolution of this case on review, we discuss those provisions in some detail.

First, the operating agreements gave Berkman, as managing member, exclusive control over plaintiffs.  Specifically, each operating agreement provided:

"4.1 Management of Company.

"(a) The management and control of the Company and its business and affairs is vested exclusively in the Managing Member of the Company[.] * * * The Managing Member shall have the authority to undertake all actions on behalf of the Company without the consent of the other Members, except to the extent expressly provided in this Agreement. No Member other than the Managing Member shall have the authority to bind the Company.  Without limitation of the foregoing, the Managing Member shall have the right, without obtaining the consent of the other Members, to (i) invest the funds of the Company in the securities of one or more issuers and to negotiate the terms of such investment * * *."

Second, the operating agreements indicated that third parties could rely on the representations of the managing member without needing to make further inquiry.  Each operating agreement stated:

"Right to Rely on Managing Member.  Any person or entity dealing with the Company may rely (without further inquiry) upon a certificate

_____

[2] In fact, Berkman was only indirectly the managing member; the actual managing members were entities controlled by Berkman.  The parties have treated Berkman as being the managing member for all relevant purposes on appeal and review, however, and we will do so as well.  *See Synectic Ventures*, 241 Or App at 553 n 1 (so noting for proceedings in Court of Appeals).

3

signed by the Managing Member as to any matter affecting the Company."

Finally, the operating agreements allowed each of plaintiff's members to invest in or manage companies in which the plaintiffs themselves invested. Specifically, each operating agreement provided, in part:

"3.2 Other Business of Members. Any Member * * * may engage independently or with others in other business and investment ventures of every nature and description and shall have no obligation to account to the Company for such business or investments or for business or investment opportunities. * * * The Members acknowledge that each Member may own securities issued by or participate in the management of companies in which the Company may invest and that neither the other Members nor the Company shall have any claim or cause of action against such Member arising from such ownership or participation."

One of the businesses in which plaintiffs invested was defendant, a company that develops medical devices. At all relevant times, Berkman -- the managing member of plaintiffs -- was also chairman of the board and treasurer of defendant. In 2004, Berkman also owned a significant number of shares in defendant, which he had pledged as security for personal debts of between $500,000 and $700,000. Berkman also periodically received interest-free loans from defendant.

Before March 2003, plaintiffs had loaned over $3 million to defendant.[3] In that month, plaintiffs and defendant entered into a loan agreement memorializing those advances. Under the loan agreement, defendant was obligated to pay back the amount of

---

[3]     In fact, those sums were loaned not just by plaintiffs, but also by two other investors, Synectic Ventures IV, LLC, and Synectic Ventures V, LLC. Plaintiffs have named those other investors as defendants in this proceeding. For the sake of simplicity, throughout this opinion we will not otherwise note the additional investors.

4

the advances, plus eight percent interest, by December 31, 2004. The debt was secured by a security interest in all of defendant's personal property -- specifically, intellectual property relating to medical devices. If defendant obtained an additional $1 million in financing from any source before the loan maturity date, however, then the loan amount would automatically be converted to shares in defendant, and plaintiffs would not be able to foreclose on the security interest.

Later in 2003, a number of the members of plaintiffs, having become disgruntled with Berkman's management, hired a law firm to represent them. On July 28, 2003, the law firm sent Berkman a letter that (among other things) requested Berkman's voluntary resignation as managing member of plaintiffs. In September 2003 and again in June 2004, Berkman signed letter agreements with those members agreeing not to enter into new obligations on behalf of plaintiffs without getting advance approval by those members. On September 2, 2004, the law firm wrote to Berkman and notified him that he would be removed as managing member as soon as the other members could elect a new managing member.

Beginning September 10, 2004 -- less than four months before plaintiffs' loan to defendant matured, and just over one week after learning that he soon would be removed as managing member -- Berkman prepared an amendment to the March 2003 loan agreement. The amendment falsely stated that it had been made on August 15, 2004. The amendment primarily extended the maturity date on the loan agreement for an extra year, from December 31, 2004, to December 31, 2005. Berkman participated on both sides of the transaction: On behalf of defendant he signed a consent resolution of

defendant's board of directors authorizing the transaction, while on behalf of plaintiffs he signed the amendment itself. If Berkman had not amended the loan agreement to extend the maturity date, then plaintiffs would have been entitled to foreclose on all of defendant's assets after December 31, 2004. Foreclosure would have made defendant's stock worthless, and would have given plaintiffs control of its intellectual property.

Berkman was removed as the managing member in December 2004. By January 2005, the new managing member had been informed about the amendment to the loan agreement that purported to extend the date for defendant to obtain the additional financing. A law firm acting on behalf of the new managing member notified defendant in late August 2005 that the loan amendment was unauthorized and objected to any attempt to convert the loan amount into shares. Notwithstanding that notification, on December 29, 2005 -- just before the amended maturity date for the loan expired -- defendant received $1 million in additional investment. In accordance with the provision of the loan agreement allowing the loan to be converted to equity, defendant converted the amount of the loan into equity shares. Because the conversion eliminated defendant's security interest in favor of plaintiffs, plaintiffs lost their opportunity to foreclose on defendant's property and were left as minority shareholders in defendant, holding less than five percent of the outstanding stock.

B.      *Trial Court Proceedings*

Plaintiffs filed an action against defendant, seeking to recover on the loan agreement and foreclose on the security interest. The complaint was based on defendant not having paid the loan as of the original maturity date, December 31, 2004. In its

6

answer, defendant relied on the loan amendment having extended the maturity date. Defendant asserted that, in accordance with the terms of the amended loan agreement, the loan had been converted into equity.

Subsequently, the parties filed cross-motions for summary judgment. Plaintiffs argued (among other things) that the amendment to the loan agreement was invalid because Berkman had a conflict of interest, the conflict deprived Berkman of authority to execute the loan agreement amendment on behalf of plaintiffs, and defendant knew that Berkman lacked that authority. *See* ORS 63.140(2)(a) (manager can bind LLC to transactions "unless the manager had no authority to act for the limited liability company in the particular matter and the person with whom the manager was dealing knew or had notice that the manager lacked authority"). Defendant offered a number of arguments in response, contending that Berkman did have authority to enter into the amendment, that Berkman had no conflict of interest, that the operating agreements permitted Berkman to invest in or manage defendant, and that the operating agreements relieved defendant of any obligation to investigate whether Berkman actually had the required authority.

The trial court denied plaintiffs' motion for summary judgment and granted defendant's motion. In a letter opinion, the trial court stated that the operating agreements expressly permitted Berkman to enter into transactions on behalf of plaintiffs with a corporation, in which he had invested in or that he was managing. Furthermore, the court held, the operating agreement relieved defendant of any obligation to inquire into Berkman's authority. Finally, the court stated, even if defendant had inquired into

7

Berkman's authority, defendant would have concluded that Berkman had authority to approve the amendment.

C.      *Court of Appeals Decision*

Plaintiffs appealed, raising essentially the same arguments that they had in the trial court. The Court of Appeals rejected those arguments and affirmed the trial court ruling. The court noted that, under ORS 63.140(2)(a), an LLC manager can bind the LLC "'unless the manager had no authority to act for the limited liability company in the particular matter and the person with whom the manager was dealing knew or had notice that the manager lacked authority.'" *Synectic Ventures*, 241 Or App at 564 (quoting ORS 63.140(2)(a)). The Court of Appeals noted that the operating agreements granted Berkman extensive authority as managing member to control plaintiffs, *id.* at 557-59, and even if Berkman had breached duties owed to plaintiffs, that did not limit his authority to act on plaintiffs' behalf. According to the Court of Appeals: "[T]here was no operation of law that stripped [Berkman] of his authority to bind plaintiffs in the ordinary course of business." *Id.* at 565. Furthermore, the Court of Appeals concluded that section 3.2 of the operating agreements permitted Berkman to engage in transactions in which he had a conflict of interest. *Id.* at 565-66. Finally, the court stated that it did not matter whether defendant knew about Berkman's conflict of interest, because (1) the operating agreements allowed third parties to rely on Berkman's authority without making any inquiry, and (2) any inquiry would have led defendant to conclude that Berkman had authority to enter into the amendment. *Id.* at 565.

II. DISCUSSION

8

On review, plaintiffs renew their earlier arguments. They contend that the trial court erred in granting summary judgment for defendant because Berkman had a conflict of interest with plaintiffs in dealing with defendant, that that conflict deprived him of authority to amend the loan agreement on behalf of plaintiffs, that defendant knew about the conflict because Berkman was its agent, and therefore plaintiffs are not bound by the amendment. Accordingly, plaintiffs maintain that they are entitled to foreclose on the security interest. For its part, defendant asserts that Berkman had authority to bind plaintiffs to the amendment, that plaintiffs' operating agreements allowed Berkman to do so despite any conflict of interest, and that defendant had a right to rely on Berkman's apparent authority to enter into the amendment. Defendant also maintains that plaintiffs ratified the amendment by their delay in objecting to it, even after Berkman had been removed as managing member.

Because this matter is before us on a grant of summary judgment, we must determine whether, as the trial court concluded, there were no genuine issues of material fact and defendant was entitled to judgment as a matter of law. *See* ORCP 47 C (stating summary judgment standard). We begin by considering the circumstances under which LLCs such as plaintiffs are bound by the acts of a manager.

A. *There was a Genuine Issue of Material Fact Whether Berkman Had a Conflict of Interest Regarding the Amendment to the Loan Agreement.*

By statute, a manager's actions generally bind a manager-managed LLC, unless the manager lacked actual or apparent authority to enter into the transaction and the other party knew or should have known that the manager lacked authority. ORS

9

63.140 provides (in part) as follows:

> "(2) Subject to subsection (3) of this section [generally giving manager authority to transfer LLC's interest in real property], in a manager-managed limited liability company:
>
> "(a) * * * Each manager is an agent of the limited liability company for the purpose of its business, and an act of a manager, including the signing of an instrument in the limited liability company's name, for apparently carrying on in the ordinary course the business of the limited liability company, or business of the kind carried on by the limited liability company, binds the limited liability company *unless the manager had no authority to act for the limited liability company in the particular matter and the person with whom the manager was dealing knew or had notice that the manager lacked authority.*"

ORS 63.140(2)(a) (emphasis added). Plaintiffs assert that both criteria have been met here: that Berkman lacked authority to enter into the amendment to the loan agreement, and that defendant knew or should have known that he lacked authority.

We agree with defendant that Berkman had authority to enter into contracts of this kind, including determining whether to extend the maturity date of loans. ORS 63.140(2)(a) supports that conclusion, and the operating agreements confirm it.[4]

Plaintiffs assert, however, that Berkman did not have authority to enter into this particular transaction (the amendment to the loan agreement) because he had a conflict of interest. We now consider that question.

---

[4] Again, the operating agreements specifically provide that "[t]he management and control of the Company and its business and affairs is vested exclusively in the Managing Member" and "the Managing Member shall have the right, without obtaining the consent of the other Members, to (i) invest the funds of the Company in the securities of one or more issuers and to negotiate the terms of such investment."

In the agency context, the term "conflict of interest"

> "encompasses situations in which the agent is acting entirely or substantially for the agent's own benefit and situations in which the agent is acting on behalf of a third party whose interest is adverse to that of the principal."

*Lindland v. United Business Investments*, 298 Or 318, 322 n 2, 693 P2d 20 (1984).  If an agent acts for a principal when the agent has a conflict of interest, the agent has breached the duty of loyalty to the principal.  *Id*. at 324 ("[C]onflict of interest or self-dealing *is* the breach of duty [of loyalty]."  (Emphasis in original.)); *see Restatement (Third) of Agency* § 8.03 (2006) (duty of loyalty includes duty not to deal with principal either as adverse party or on behalf of adverse party).

An agent ordinarily lacks authority to act on behalf of a principal in a transaction in which the agent has a conflict of interest.  As this court explained in *Fine v. Harney Co. National Bank*, 181 Or 411, 447-48, 182 P2d 379 (1947):

> "It is an established principle of the law of agency that an agent cannot bind his principal in a matter in which his own interest conflicts with the duty he owes his principal.  As stated in 1 Mechem on Agency (2d ed) 535, § 754: 'It is often said that his endeavor to do so operates as an immediate revocation of his authority.  That an agent undertakes to do so is therefore enough to put the other party on his guard.'"

(Additional citations omitted.)  *See State v. Miller*, 47 Or 562, 566, 85 P 81 (1906) ("It is elementary * * * that an agent cannot bind his principal, even in matters touching his agency, where he is known to be acting for himself, or to have an adverse interest." (Internal quotation marks and citation omitted.))

We agree with plaintiffs that Berkman had a conflict of interest when he approved the loan amendment.  At that time, Berkman was managing member, and thus

11

an agent, of plaintiffs. *See* ORS 63.140(2)(a) (in manager-managed LLCs, "[e]ach manager is an agent of the [LLC]"). But as chairman of the board and treasurer of defendant, Berkman also was an agent of defendant. Berkman thus was acting as an agent for two principals with conflicting interests. Furthermore, Berkman was indirectly but personally interested in favoring defendant by amending the loan agreement to keep plaintiffs from foreclosing on defendant's security interest. If plaintiffs had foreclosed, then Berkman's shares in defendant would have become worthless, while defendant's demise would have deprived Berkman of a source of interest-free loans.

By statute, however, a manager's duty of loyalty to the LLC does not prohibit self-interested transactions, as long as they are fair to the LLC. *See* ORS 63.155(9)(b) (making duties of ORS 63.155(2) - (8) applicable to manager of manager-managed LLC); ORS 63.155(6)(a) (member of member-managed LLC may transact business with LLC, provided that the transaction "must be" "[f]air to the limited liability company").[5] *See also* ORS 63.155(5) (made applicable to managers by ORS

---

[5]     ORS 63.155(6) provides:

"A member of a member-managed limited liability company may lend money to or transact other business with the limited liability company, provided that any loan or transaction between the member and the limited liability company must be:

"(a) Fair to the limited liability company;

"(b) Authorized by an operating agreement; or

"(c) Authorized or ratified by a majority of the disinterested members or by a number or percentage of members specified in the

12

63.155(9)(b); "[a] member of a member-managed limited liability company does not violate a duty or obligation under this chapter or under any operating agreement of the limited liability company merely because the member's conduct furthers the member's own interest"). In this case, the amendment to the loan agreement that Berkman ultimately approved was at least arguably one-sided in favor of defendant: defendant avoided foreclosure and obtained a one-year extension of a 21-month loan, while plaintiffs received only an additional year's interest on the extension. As a result, there is a genuine issue of material fact whether the amendment was fair to plaintiffs.

Further elaboration is unnecessary. Berkman's personal interests, and his interests as chairman of the board and treasurer of defendant, conflicted with plaintiffs' interests as to whether the loan agreement should be amended, and there was a question for the factfinder as to whether the amendment was fair to plaintiffs. Accordingly, there was a genuine issue of material fact regarding whether Berkman had a conflict of interest that breached his duty of loyalty in a manner that deprived him of authority to enter into the amendment.

Defendant argues that, regardless, a provision of plaintiffs' operating agreements permitted Berkman to act on behalf of plaintiffs, notwithstanding any conflict of interest. We now turn to that question.

B.    *Plaintiffs' Operating Agreements Did Not Specifically Permit the Conflict of Interest.*

---

operating agreement after full disclosure of all material facts."

Although an agent ordinarily lacks authority to enter into a transaction in which the agent has a conflict of interest, the principal may authorize the transaction despite the conflict. In the case of LLCs, ORS 63.130 provides, in part:

"(4) Unless otherwise provided in the articles of organization or any operating agreement, the following matters of a * * * manager-managed limited liability company require the consent of a majority of the members:

"* * * * *

"(h) A transaction involving an actual or a potential conflict of interest between * * * a manager and the limited liability company[.]"

ORS 63.130(4)(h). *See also* ORS 63.155(6)(b), (c) (permitting self-interested transactions that are authorized by operating agreement or that are approved by members).

Defendant does not assert that a majority of plaintiffs' members formally approved Berkman's conflict of interest in making the amendment, as required by that statute.[6] Defendant instead asserts that the operating agreements here authorized this sort of conflict of interest transaction from the outset. *See id.* (majority consent required to approve conflict of interest "[u]nless otherwise provided in the articles of organization or any operating agreement"). Defendant relies specifically on section 3.2 of the operating agreements, which for convenience we repeat here:

"3.2 <u>Other Business of Members</u>. Any Member * * * may engage

_____

[6] Defendant did offer evidence that one member of one plaintiff had known that Berkman was involved in managing defendant and had approved that relationship, but defendant does not contend that that knowledge somehow amounts to approval by a majority of plaintiffs' members under ORS 63.130(4)(h).

14

independently or with others in other business and investment ventures of every nature and description and shall have no obligation to account to the Company for such business or investments or for business or investment opportunities. * * * The Members acknowledge that each Member may own securities issued by or participate in the management of companies in which the Company may invest and that neither the other Members nor the Company shall have any claim or cause of action against such Member arising from such ownership or participation."

Defendant contends that, because Berkman was labeled as "[m]anaging [*m*]*ember*" in the

operating agreements, Berkman was permitted to act despite the conflict by section 3.2,

which applies to "[a]ny [m]ember."

We agree that, at common law, a principal could authorize an agent to

engage in a transaction in which the agent has a conflict of interest with the principal. In

doing so, however, the authorization must be specific:

"[A] general power or authority given to the agent to do an act in behalf of the principal does not extend to a case where it appears that the agent himself is the person interested on the other side. If such a power is intended to be given, it must be expressed in language so plain that no other interpretation can rationally be given it, for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time."

*Fine*, 181 Or at 448 (internal quotation marks and citation omitted). In the LLC context,

the legislature has imposed a similar requirement. ORS 63.155 provides, in part:

"(10) The * * * operating agreement of a limited liability company may not:

"(a) Eliminate completely the duty of loyalty under subsection (2) of this section, but the * * * operating agreement may:

"(A) *Identify specific types or categories of activities that do not violate the duty of loyalty*, if not unconscionable[.]"

(Emphasis added.)

15

As we will explain, we conclude that section 3.2 of the operating agreements did not specifically allow Berkman to engage in transactions where he had a conflict of interest that breached his duty of loyalty.  Section 3.2 allows only ordinary members, who are essentially passive investors in the LLC, to invest in or manage other corporations.  It does not specifically allow the managing member, who essentially controls all aspects of LLC operations, to engage in transactions in which the manager has a conflict of interest.

In manager-managed LLCs, substantial differences exist between the powers and duties of a manager and the powers and duties of a member.  By statute, the manager essentially has exclusive authority to run the LLC.  ORS 63.130 provides, in part:

> "(2) In a manager-managed limited liability company, unless otherwise provided in the articles of organization or any operating agreement:

> "* * * * *

> "(b) Except as otherwise provided in subsections (3) and (4) of this section, any matter relating to the business of the limited liability company may be exclusively decided by the manager or, if there is more than one manager, by a majority of the managers[.]"

ORS 63.130(2)(b).[7]  *See also* ORS 63.140(2)(a) (manager is agent of LLC, and LLC is generally bound by actions of manager within the ordinary scope of LLC business).  That

---

[7]    The exceptions in subsections (3) and (4) include such matters as amending the operating agreement (ORS 63.130(3)(a)), admitting a new member (ORS 63.130(4)(b)), or selling all or essentially all of the LLC's property (ORS 63.130(4)(d)).

extensive authority granted to managers is limited in a few instances. In particular, as we have already noted, a majority of the members must approve any "transaction involving an actual or a potential conflict of interest between * * * a manager and the limited liability company," unless the operating agreement otherwise provides. ORS 63.130(4)(h).

The same statutes, by contrast, make the members of a manager-managed LLC (with few exceptions) little more than passive investors in the LLC. Ordinary members have essentially no control over the business. *See* ORS 63.130(2)(b) (generally, "any matter relating to the business of the limited liability company may be exclusively decided by the manager"); ORS 63.140(2)(a) (in manager-managed LLCs, "[a] member is not an agent of the limited liability company for the purpose of its business solely by reason of being a member"). In this case, plaintiffs' operating agreements track the general statutory principles that grant the manager authority to run the business, while withholding that authority from ordinary members.

By statute, the heightened powers of the manager also carry with them specific duties toward the LLC. *See* ORS 63.155(9)(b) (making duties of ORS 63.155(2) - (8) applicable to manager); ORS 63.155(2) - ORS 63.155(8) (listing duties). In particular, those duties include the obligation generally "to refrain from dealing with the limited liability company in a manner adverse to the limited liability company and to refrain from representing a person with an interest adverse to the limited liability

17

company, in the conduct * * * of the limited liability company's business."  ORS 63.155(2)(b) (subject to certain exceptions).[8] *See also* ORS 63.130(4)(h) (generally requiring approval of members of transaction where manager has conflict of interest with LLC).

In contrast, the members of a manager-managed LLC owe no duty to the LLC or the other members.  ORS 63.155(9)(a) provides:

"(9) In a manager-managed limited liability company:

"(a) A member who is not also a manager owes no duties to the limited liability company or the other members solely by reason of being a member[.]"

With that background, we return to the question whether section 3.2 complies with ORS 63.155(10)(a)(A) by specifically identifying types or categories of activities that do not violate the duty of loyalty.  We first observe that section 3.2 speaks only generically of "members," and it relieves members of any obligation either to "account to [plaintiffs]," or to be liable to plaintiffs or the other members, for investing in or managing other businesses.  Section 3.2 permits ordinary members to invest their own money in other businesses and/or to manage other businesses that are doing business with plaintiffs.  But investment or management by an ordinary member does not involve any

---

[8]     We have mentioned the exceptions previously.  They are ORS 63.155(5) (member of member-managed LLC does not violate duty "merely because the member's conduct furthers the member's own interest") and ORS 63.155(6) (member of member-managed LLC may transact business with LLC if transaction is fair to LLC, or operating agreement authorizes transaction, or transaction is authorized or ratified by members).  Those exceptions also apply to the manager of a manager-managed LLC.  *See* ORS 63.155(9)(b) (so noting).

18

conflict of interest between agent and principal, because ordinary members of a manager-managed LLC are not agents of the LLC, ORS 63.140(2)(a), and so they have no duty of loyalty to put the LLC's interest first. An ordinary member of plaintiffs does not have the authority to cause plaintiffs to take detrimental actions that might benefit that member's outside investments. In effect, section 3.2 simply restates what ORS 63.155(9)(a) already provides: "A member who is not also a manager owes no duties to the limited liability company or the other members solely by reason of being a member[.]"

What is not in section 3.2, however, is any suggestion -- much less a specific statement as required by ORS 63.155(10)(a)(A) -- that the *managing* member may bind the plaintiffs to transactions when the managing member has a conflict of interest. Unlike ordinary members, the managing member does control LLC operations. Unless checked, that authority would give the managing member vast opportunities to personally benefit at the LLC's expense. For that reason, the manager of an LLC is subject to a statutory duty "to refrain from dealing with the limited liability company in a manner adverse to the limited liability company and to refrain from representing a person with an interest adverse to the limited liability company." ORS 63.155(2)(b). Nothing in section 3.2 suggests any intent to permit the managing member to act against plaintiffs' interests or to act in the interest of a party adverse to plaintiffs, such as defendant. Section 3.2 does not purport to waive the duty of loyalty or to permit conflicts of interest -- duties that do not apply to ordinary members, but which were imposed by statute on Berkman as managing member. Section 3.2 also does not purport to change the default rule that transactions involving a conflict of interest by the manager must be

approved by a majority of members. *See* ORS 63.130(4)(h). Even considered as a question of contractual interpretation, we are not persuaded that section 3.2's generic release of any obligation by "[m]embers" to "account" for other investments was intended to waive the *managing* member's duty to avoid conflicts of interest. We do not agree that section 3.2 qualifies as the sort of specific approval of a managing member's duty to avoid conflicts of interest as required by ORS 63.155(10)(a)(A).

Because section 3.2 does not specifically identify or authorize the managing member to engage in transactions in which the managing member has a conflict of interest, ORS 63.155(10)(a)(A), we conclude that the operating agreements did not specifically permit Berkman to approve the amendment if he had a conflict of interest.[9] Accordingly, the operating agreements do not call into question our previous conclusion that there was a genuine issue of material fact as to whether Berkman's conflict of interest deprived him of authority to approve the amendment.

Even if Berkman lacked authority to amend the loan agreement, however, plaintiffs would still be bound by the amendment unless defendant knew or should have known that Berkman lacked authority. *See* ORS 63.140(2)(a) (so stating). We turn to

---

[9] Defendant also asserts that Berkman had the same conflict of interest when the loan agreement itself was formulated, so the loan agreement itself must be invalid as well. Even if Berkman lacked authority to enter into the original loan agreement, however, the original transaction may have been fair, *see* ___ Or at ___ (slip op at 12-13), or plaintiffs may have ratified it, *see* ___ Or at ___ (slip op at 23-24) (discussing principal's ratification of agent's unauthorized act). Regardless, the issue on summary judgment is not Berkman's authority to enter into the original loan agreement, but Berkman's authority to enter into the amendment.

that question.

C. *Defendant Would Have Known That Berkman Had a Conflict of Interest, So Defendant Would Have Known That Berkman Lacked Authority to Enter Into the Amendment on Behalf of Plaintiffs.*

As noted, each operating agreement contained the following provision:

"Right to Rely on Managing Member.  Any person or entity dealing with the Company may rely (without further inquiry) upon a certificate signed by the Managing Member as to any matter affecting the Company."

Defendant asserts that, under the operating agreements, it was entitled to rely on Berkman's authority to approve the amendment on behalf of plaintiffs without making any further inquiry.  Defendant's argument misses the point.  As chairman of the board and treasurer for defendant, Berkman was an agent for defendant.  Essentially everything that Berkman knew therefore must be imputed to defendant.  *See FDIC v. Smith*, 328 Or 420, 429, 980 P2d 141 (1999) ("A potential corporate plaintiff is not a sentient being and, therefore, cannot 'know,' be aware of, or discover anything, except through the agency of its officers, directors, and employees.  A corporation generally is charged with knowledge of facts that its agents learn within the scope of their employment."  (Citations omitted.)); *Phillips v. Colfax Company, Inc.*, 195 Or 285, 300, 243 P2d 276, *on reh'g*, 245 P2d 898 (1952) ("'The general rule is that the corporation is affected or charged with knowledge of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, even though the officer or agent does not in fact communicate his knowledge to the corporation through its other officers or agents, or its board of directors[.]'"  (Internal quotation marks and citation omitted.)).

21

Moreover, defendant would have actually known the facts that would show that Berkman's conflict of interest deprived him of authority. Defendant does not and cannot dispute that it knew that Berkman was managing member for plaintiffs or that he executed the amendment to the loan agreement on behalf of plaintiffs. Defendant also cannot deny having known that Berkman was its own chairman of the board and treasurer, that Berkman had a significant financial stake in it through his stock ownership, or that defendant periodically was giving Berkman interest-free loans. And of course defendant knew all the details of the allegedly unfair amendment to the loan agreement itself. In short, defendant already knew essentially everything about Berkman's conflict of interest.

If the factfinder concludes that Berkman's conflict of interest with plaintiffs deprived him of authority to approve the amendment to the loan agreement, then defendant knew about that conflict of interest, both in fact and as imputed by the knowledge of its agent. Because defendant would have known that Berkman had a conflict, defendant would have known that Berkman lacked authority to enter into the amendment on behalf of plaintiffs. The provision of the operating agreements suggesting that third parties need make no further inquiry into Berkman's authority would be irrelevant under those circumstances. Unlike third parties dealing with plaintiffs at arm's length, defendant would not have needed to make any further inquiry; defendant already would have known the answer. *See Portland v. American Surety Co.*, 79 Or 38, 43, 153 P 786, *on motion to further modify decree*, 154 P 121 (1916) (principal will not be bound by acts of agent, even though acts were within agent's apparent authority, "in the presence

of the actual knowledge of the third party as to the real scope of the agent's authority").

To summarize: Under ORS 63.140(2)(a), an LLC is not bound by a transaction if the manager lacked authority to enter into the transaction and the other party knew or should have known of that lack of authority. We conclude that there was a genuine issue of material fact whether Berkman's conflict of interest in agreeing to the amendment on behalf of plaintiffs deprived him of authority to act on behalf of plaintiffs in that transaction. Defendant would have had both actual and imputed knowledge of the conflict of interest and the lack of authority. Accordingly, unless plaintiffs later ratified the amendment (an issue that we will consider next), plaintiffs would not be bound by the amendment to the loan agreement.

D. *There Is An Issue of Material Fact Whether Plaintiffs Ratified the Amendment.*

Finally, defendant argues that there is an alternative ground that supports the trial court's summary judgment ruling. According to defendant, even if Berkman lacked authority to enter into the amendment, plaintiffs' seven-month delay in making any objection amounted to ratification by silence of the unauthorized act. *See Michel v. ICN Pharmaceuticals*, 274 Or 795, 805, 549 P2d 519 (1976) (if purported principal is told of actions of purported agent "under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time is, unless explained[,] sufficient evidence of affirmance" (internal quotation marks and citation omitted)); *Phillips*, 195 Or at 300 ("Generally, where a corporation through its proper officers takes and retains the benefits of the unauthorized act or contract of an officer or agent and fails to repudiate the

23

transaction and offer restitution within a reasonable time, it thereby ratifies and becomes bound by such act or contract if its action is taken with full knowledge of the material facts * * *." (Internal quotation marks and citation omitted.)).

Neither the trial court nor the Court of Appeals reached defendant's ratification argument. Nevertheless, we have considered that argument and, at this stage of the proceedings, reject it. Although a principal may ratify the unauthorized acts of an agent by silence, we do not agree that the facts of this case justify summary judgment in defendant's favor. "It is a question of fact in the particular circumstances whether the lapse in time [in objecting] is sufficient to constitute ratification." *Restatement (Third) of Agency* § 4.01 comment f; *see Michel*, 274 Or at 804-05 (noting that "the question of ratification is ordinarily a question of fact"); *Phillips*, 195 Or at 296 ("[r]atification is a question of fact" (internal quotation marks and citation omitted)). Specifically, ratification by silence requires the factfinder to draw an inference about the principal's state of mind. *See Michel*, 274 Or at 805 n 2 ("Ratification is based upon waiver -- the intentional relinquishment of a known right -- rather than upon estoppel."). On this record we cannot conclude that there is no issue of fact as to whether the length of time that plaintiffs delayed in making their objection served to ratify the amendment.[10]

---

[10] Defendant contends that, in *Michel*, this court held that silence became acquiescence as a matter of law because the party had acted consistently with the agreement for 20 days. *See* 274 Or at 805 ("in delaying its 'disaffirmance' for 20 days defendant did not do so within a reasonable time, in our judgment"). Even setting aside the factual differences in that case, defendant does not accurately characterize *Michel*, which was before this court in an entirely different procedural posture. In *Michel*, this

24

## III.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have also asserted on review that the trial court should have granted summary judgment in their favor.  We disagree.  For the reasons we have already noted, there are triable questions of fact in this case:  whether the transaction was fair to plaintiffs, and whether plaintiffs ratified the amendment by inaction.  Accordingly, we affirm the trial court insofar as it denied plaintiffs' motion for summary judgment.

## IV. PLAINTIFFS' APPEAL OF ATTORNEY FEE AWARD

After entry of the general judgment, the trial court entered a supplemental money judgment for attorney fees and costs against plaintiffs, and plaintiffs separately appealed that supplemental judgment.  Our conclusion that the trial court erred in granting summary judgment necessarily reverses that attorney fee award.  *See* ORS 20.220(3)(a)  ("If the appellate court reverses the judgment [as to which an award of attorney fees or costs relates], the award of attorney fees or costs and disbursements shall be deemed reversed[.]").  Without deciding whether a separate notice of appeal was necessary in light of the statutory text, we also reverse the trial court's supplemental

court was reviewing the record *de novo* in an appeal from a decree in equity.  *Id.* at 797.  Furthermore, the trial court had not made any findings of fact on the question of ratification, so there was no issue about deferring to those findings.  *Id.* at 804-05.  Unlike *Michel*, the question before us now is not what findings of fact this court might make on a complete record, but whether the summary judgment record is sufficient to create a question of fact for the jury.  *See Phillips*, 195 Or at 302 ("[I]t must be remembered that the matter at bar is an action at law.  It is not a suit in equity calling for a trial *de novo* on appeal with the incident duty to make our own independent appraisal of the relative weight of testimony adduced.").  As we have explained, there are genuine issues of material fact for the jury to resolve here.

25

judgment.

## V. CONCLUSION

Under ORS 63.140(2)(a), an LLC is not bound by the act of its manager if the manager lacked authority and if the other party knew or should have known that the authority was lacking. Here, although Berkman had authority to enter into the sorts of transactions represented by the amendment to the loan agreement at issue, we agree with plaintiffs that there was a genuine issue of material fact whether Berkman had lost the authority to enter into the amendment. Berkman had a conflict of interest when he attempted to cause plaintiffs to enter into the amendment, both because he was also acting as an agent for defendant, and because he was personally interested in the transaction. A factfinder could permissibly conclude that that conflict of interest breached Berkman's duty of loyalty, thus depriving Berkman of authority to enter into the amendment on behalf of plaintiffs. Furthermore, defendant would have known that Berkman had that conflict of interest and thus lacked the authority to enter into the amendment. Finally, a factfinder could find that plaintiffs had not ratified the amendment by their delay in rejecting it. Under those circumstances, plaintiffs would not be bound by the amendment to the loan agreement. Based on the foregoing, the trial court erred both in granting defendant summary judgment and in entering a supplemental money judgment for attorney fees and costs against plaintiffs.

The decision of the Court of Appeals is reversed. The judgments of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

26