SHORR, J.
*342 Plaintiff sued defendant, Central Point Pawn, LLC (CPP), after CPP failed to repay a loan from plaintiff that was arranged by a member-manager of CPP, without the knowledge or approval of the other member-managers. CPP moved for summary judgment, maintaining that it was not responsible for repaying the loan because it was not made in the ordinary course of business and not approved by a majority of CPP's member-managers. The trial court granted CPP's motion.[1] For the reasons explained below, we reverse and remand.
In reviewing a trial court's summary judgment ruling, we view the evidence in the light most favorable to the nonmoving party, here plaintiff, to determine whether there is a genuine issue of material fact that precludes summary judgment. Rush v. Corvallis School District 509J , 291 Or.App. 252, 253, 419 P.3d 746 (2018). There is no genuine issue of material fact if, "based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. We state the facts and apply the law consistently with that standard.
*438 CPP is a member-managed limited liability company (LLC) that owns and operates a pawn shop in Oregon. Under its operating agreement, the purpose of CPP is to "engage in any Pawnbroker act or activity for which a limited liability company may be organized under the laws of the state of Oregon."[2] The operating agreement does not *343 specify any procedures for borrowing money that will be used for CPP's business operations.
In early 2011, plaintiff met with Bogart, a member-manager and CPP's registered agent, and proposed to extend a line of credit to CPP. Bogart accepted the loan on behalf of CPP and borrowed $ 48,800 over the next six months. In a declaration submitted to the trial court, Bogart averred that the loan was "needed for and used in the operation of CPP's pawn shop." Based on the summary judgment record, plaintiff and Bogart did not memorialize the loan agreement in a written contract, but evidence of the loan was furnished to CPP's tax preparer. Undisputed evidence in the summary judgment record shows that Bogart did not consult with CPP's other member-managers regarding the loan, and the other member-managers only learned of the loan when plaintiff brought this action against CPP to recover the balance due.
Plaintiff brought the underlying lawsuit when CPP failed to repay the loan.[3] CPP argued that it was not bound by the loan agreement between Bogart and plaintiff. In its motion for summary judgment, CPP maintained that the debt owed to plaintiff was not incurred in the ordinary course of business-because, as CPP put it, pawnbrokers are "in the business of loaning money-not being debtors"-nor was the loan approved by a majority of the member-managers. During the summary judgment hearing, CPP took the position that a loan from a bank or other "standard lender" would "probably" be in the ordinary course of business but a loan from "an unsecured private party" like plaintiff would not.
The trial court granted CPP's motion with a ruling that did not explain the bases for its decision. During *344 the summary judgment proceedings, the parties primarily focused their arguments on whether CPP borrowed money from plaintiff in the ordinary course of its business. In light of the arguments presented at summary judgment, we understand the court's ruling to mean that the court concluded that CPP did not, as a matter of either fact or law, borrow money from plaintiff in the ordinary course of business, and, therefore, that CPP was not obliged to repay plaintiff.
ORS 63.140 governs whether a member of an LLC can bind the LLC to agreements with third parties. Under that statute,
"(a) Each member [of an LLC] is an agent of the limited liability company for the purpose of its business, and an act of a member, including the signing of an instrument in the limited liability company's name, for apparently carrying on in the ordinary course the business of the limited liability company, or business of the kind carried on by the limited liability company, binds the limited liability company unless the member had no authority to act for the limited liability company in the particular matter and the person with whom the member was dealing knew or had notice that the member lacked authority.
"(b) An act of a member that is not apparently for carrying on in the ordinary course the business of the limited liability company, or business of the kind carried on by the limited liability company, binds *439 the limited liability company only if the act was authorized by the other members."
ORS 63.140(1).
On appeal, plaintiff argues, as he did below, that there is at least a triable issue of fact whether the loan to CPP was arranged by Bogart in the ordinary course of CPP's business. CPP, for its part, did not argue at summary judgment or on appeal that Bogart lacked authority to bind CPP to any and all loan agreements. Nor did CPP contend that plaintiff knew or had notice that Bogart lacked authority to bind CPP to the loan in question. Rather, CPP argues only that the debt was not incurred in the ordinary course of business, because CPP operated "a pawnshop in the business of loaning money to others in exchange for possession *345 of collateral," and "was not in the business of borrowing money in the form of handshake, paperless, unsecured loans with individuals who happened to walk through the door." Essentially, CPP contends that this particular loan was so unusual that it could not possibly have been taken on in the ordinary course of business and, therefore, required authorization by the other member-managers, which Bogart neither sought nor secured.
The key question on appeal, therefore, is whether a reasonable juror could find that CPP incurred the debt from plaintiff's loan in the ordinary course of business as provided in ORS 63.140(1)(a).[4] Only if that predicate inquiry is answered in the negative does the subsequent inquiry-whether CPP's indebtedness was nevertheless approved by a majority of the member-managers under ORS 63.140 (1)(b) -become relevant.
"Ordinary course" of business is not a defined statutory term under Oregon law. When we encounter an undefined statutory phrase, we assume, at least at first, its "plain, natural, and ordinary" meaning. DCBS v. Muliro , 359 Or. 736, 745-46, 380 P.3d 270 (2016). When the phrase is a legal term of art, however, we initially "turn to legal dictionaries to understand the established legal meaning." State v. McNally , 361 Or. 314, 322, 392 P.3d 721 (2017). We "potentially also consider the overall statutory scheme in which a legal term appears, as well as the meaning that the term has for regulators who oversee the field." Comcast Corp. v. Dept. of Rev. , 356 Or. 282, 296, 337 P.3d 768 (2014). Further, we can also look to other provisions of related statutes and opinions (existing at the time of the statute's enactment) interpreting the pertinent statutory phrase. Polacek and Polacek , 349 Or. 278, 284, 243 P.3d 1190 (2010).
The phrase "ordinary course" of business is a legal term of art that is commonly used in the law governing business transactions and commercial disputes. At the time that ORS 63.140 was enacted, "ordinary course of business" was defined as follows:
*346 "The transaction of business according to the common usages and customs of the commercial world generally or of the particular community or (in some cases) of the particular individual whose acts are under consideration. * * * In general, any matter which transpires as a matter of normal and incidental daily customs and practices in business."
Black's Law Dictionary 1098 (6th ed. 1990).[5] That definition supports a broad construction that encompasses routine and expected business activity both directly related and ancillary or incidental to a company's primary business purpose. Further, an act or transaction can be in the "ordinary course" even if it only occurs occasionally, so long as the act or transaction is sufficiently related or incidental to maintaining or performing normal, everyday business operations. For example, as CPP acknowledged to the trial court, a business can, in the ordinary course of business, occasionally borrow money from a bank to be used for business operations.
Oregon case law provides additional insight into the meaning of the phrase "ordinary course" of business. While we have found no case law construing the phrase *440 "ordinary course" under ORS 63.140 or other sections governing LLCs, there is Oregon case law examining the same or very similar terms in the context of corporations and commercial law. In Sailer v. Land-Livestock-Rec., Inc. , 268 Or. 531, 534-35, 522 P.2d 214 (1974), for example, the Supreme Court examined a similar phrase-"usual and regular course of business"-in former ORS 57.511 (1973), repealed by Or Laws 1987, ch. 52, § 181, which governed corporations organized under that chapter and those doing business in this state.[6] The court determined that it was in the "usual and regular" course of business for a commercial development company to mortgage property because "it is a matter of common business practice" for a commercial landowner who wishes to develop property to "mortgage the property in order to secure the necessary financing for the overall project." Sailer , 268 Or. at 535, 522 P.2d 214. *347 Based on our analysis, we conclude that the legislature, by using the legal term of art "ordinary course" of business in ORS 63.140 when describing the powers of the members of an LLC, intended to encompass transactions that are part of the normal or customary routine-even if only occasional-of the commercial world generally, or of businesses of the same kind, or of a particular business. Whether any particular transaction is in the ordinary course of business is necessarily a fact-intensive inquiry that will turn on the nature of the transaction and the broader context in which the transaction occurred.
With the foregoing in mind, we conclude that the summary judgment record in this case contains evidence legally sufficient to at least raise a triable issue of fact whether CPP incurred the debt from plaintiff's loan in the "ordinary course" of its business. First, the fact that CPP's business primarily involves loaning money in exchange for physical possession of collateral does not foreclose the possibility that it is ordinary practice for CPP, or businesses similar to CPP, to borrow money to sustain business operations. Whatever the meaning of "ordinary course" of business, it is not so limited as to refer only to actions directly derived from a company's primary purpose as defined in its articles of organization or operating agreement. Indeed, few businesses, if any, exist primarily to borrow money, but nothing in our statutes or case law suggests that an LLC, regardless of its principal business purpose, cannot incur debt in the ordinary course of business, including by accepting loans from third parties for business operations. It appears axiomatic that a company that is in the business of loaning money must have a source of funds from which to loan, and those funds may be themselves borrowed from another source.[7]
Second, Bogart's declaration includes a statement that the loan was "needed for and used in the operation of CPP's pawn shop." Although the record does not contain evidence of exactly how the loan was used, there is evidence that CPP recorded the loan in its ledgers and provided *348 information regarding the loan to its tax preparer, which at least raises a fact issue of whether the borrowed money was used for ordinary business purposes.
Third, CPP contends that the informal nature of the loan means that CPP did not incur the debt in the "ordinary course" of its business. But, at least on this record, the formality of the loan as it relates to whether CPP incurred debt in the ordinary course of business is a fact issue from which the jury can draw its own conclusions. Certainly, the absence of loan documents or more extensive evidence in the record confirming the loan are facts in CPP's favor, but there is at least a fact issue created by the declarations of plaintiff and CPP's member-manager Bogart regarding the existence and purpose of the loan and the accounting for the loan in CPP's records.
Finally, ORS 63.140(1)(a) provides that an LLC will not be bound by the acts of its members-even if those acts are apparently for the LLC carrying on in the ordinary *441 course of its business-if the member lacks authority to so act and the person with whom the member was dealing knew or had notice that the member was acting outside the scope of his or her authority. See Synectic Ventures I, LLC v. EVI Corp. , 353 Or. 62, 80-81, 294 P.3d 478 (2012) (discussing the "knew or had notice" requirement in ORS 63.140(1)(a) ). Under ORS 63.034(2), a person has notice of a fact if the person "(a) knows of it; (b) has received a notification of it; or (c) has reason to know it exists from all the facts known to the person at the time in question." Plaintiff, for his part, contended at summary judgment that he was unaware that CPP had an operating agreement and that he did not otherwise know or have notice that Bogart might not be authorized to accept plaintiff's loan offer on CPP's behalf. As noted, CPP did not contest this issue below, and CPP has not pointed to evidence refuting plaintiff's assertion.
In sum, the trial court erred when it granted defendant's motion for summary judgment. Based on the evidence in the summary judgment record, there is a genuine issue of material fact as to whether CPP incurred the debt from plaintiff's loan in the "ordinary course" of business.
Reversed and remanded.

The trial court's ruling consisted of one line: "Defendant's Motion for Summary Judgment is allowed. See ORS 63.130(4)(g)." The parties had raised arguments under both ORS 63.130(4)(g) and ORS 63.140(1), and do so again on appeal. ORS 63.130 describes the rights of LLC members and managers with respect to the management and operation of the LLC. ORS 63.140, by contrast, describes the power of members and managers with respect to the LLC's relationships with third parties. Given the nature of plaintiff's action against CPP, we conclude that ORS 63.140 provides the appropriate statutory framework, and we rely on that statute alone to resolve this appeal.

Under ORS 726.010(1), a pawnbroker is defined as
"a person, copartnership, association or corporation that:
"(a) Lends money at a rate of interest greater than 10 percent per annum on the deposit or pledge of personal property;
"(b) Purchases personal property on the direct or implied condition of selling the personal property back at a stipulated price that would amount to paying interest or consideration in excess of 10 percent per annum; or
"(c) Does business as a storage warehouse operator and lends money at a rate of interest greater than 10 percent per annum upon goods, wares, merchandise or personal property pledged or deposited as collateral security."

Plaintiff did not seek to recover from Bogart, the member-manager who arranged the loan.

ORS 63.140(1)(a) refers to "carrying on in the ordinary course the business of the [LLC]." We conclude that there is no meaningful difference between that phrase and the phrase "ordinary course of business."

ORS 63.140 was enacted as Oregon Laws 1993, chapter 173, section 30.

At least in the context of this appeal, we understand "usual and regular course of business" to be synonymous with "ordinary course" of business. See Black's at 1097 (defining "ordinary" as "regular; usual; normal; common").

We note that CPP's operating agreement suggests that $ 125,000 in capital was loaned to the LLC by two of its member-managers, Richard and Pamela Bennett. Nothing indicates that the Bennetts' loan was to be the only loan or capital to be received by the LLC.